## KELLEY *v.* MILAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.

No. 206. Argued April 4, 5, 1888. — Decided April 23, 1888.

In this case certain negotiable bonds, issued by the town of Milan, Tennessee, were held to have been issued without lawful authority.

A municipal corporation, in order to exercise the power of becoming a stockholder in a railroad corporation, must have such power expressly conferred by a grant from the legislature; and even such power does not carry with it the power to issue negotiable bonds in payment of the subscription, unless the latter power is expressly, or by reasonable implication, conferred by statute.

Certain provisions of the statutes of Tennessee considered and held not to confer power on the town of Milan to issue the bonds in question.

In a suit in chancery, brought by the town authorities to have the bonds declared invalid, a decree had been entered declaring them valid, on a consent to that effect signed by the mayor of the town: *Held*, that the consent of the mayor could give no greater validity to the bonds than they before had, and that the decree was not an adjudication of the question of such validity.

THIS was an action at law, brought in the Circuit Court of the United States for the Western District of Tennessee, by Albert Kelley and Lawrence D. Alexander, co-partners under the firm name of Kelley & Alexander, citizens of New York, against the mayor and aldermen of Milan, a municipal corporation organized under the laws of Tennessee, to recover the sum of $5040, being the amount of 144 coupons, for $35 each, cut from twelve bonds purporting to have been issued by the defendant, bearing date July 1, 1873, each for the payment of the sum of $1000, payable to —— or bearer, on the 1st of July, 1893, 24 of which coupons matured on the 1st of July, 1876, 24 on the 1st of July, 1877, 24 on the 1st of July, 1878,

24 on the 1st of July, 1879, 24 on the 1st of July, 1880, 24 on the 1st of July, 1881. Interest was claimed on each coupon from its maturity.

Each of the bonds was in the following form, all being alike except as to the numbers:

"No. 1.        State of Tennessee, Town of Milan.        $1000.

"Be it known that the Town of Milan, by its mayor and aldermen, in consideration of the location of the Mississippi Central Railroad by said town, the citizens thereof, in pursuance of the laws of Tennessee authorizing the same, having agreed to issue bonds, payable on twenty years' time, to the amount of twelve thousand dollars, with annual interest at seven per cent, with coupons attached, in bonds of one thousand dollars each;

"And whereas the people of Milan voted the same by a majority and in the form required by law, the vote being in pursuance of due notice, and in all respects according to the laws of Tennessee, said bonds to be payable to the Mississippi Central Railroad, under lease and control of the Southern Railroad Association:

"Now, be it known, that the Town of Milan, by its mayor and aldermen, in pursuance of the authority given by the people thereof, and in obedience to the duty required of them, issues and delivers this bond, being one of twelve; and said Town of Milan hereby acknowledges itself to owe and be indebted to —— or bearer, in the sum of one thousand dollars, which sum said Town of Milan binds itself to pay, in lawful money of the United States, to the Mississippi Central Railroad Company, or to the order of the Southern Railroad Association, or bearer, in the city of New York, on or before the first day of July, in the year of our Lord one thousand eight hundred and ninety-three, with interest at the rate of seven per cent per annum, payable annually on the first day of July of each year, on presentation of the proper coupons, hereto annexed.

"And the Town of Milan, by its mayor and aldermen, hereby pledges the legal responsibility and the faith of said

town for the payment of said coupons and bond according to the terms and effect hereof.

"In testimony whereof, the mayor and aldermen of the Town of Milan have caused the signature of the mayor to be hereto set, and the seal of the corporation to be affixed, this first day of July, 1873, A.D.

"[L.S.]                                        "A. JORDAN,
                              "*Mayor of the Town of Milan.*"

The declaration alleged that the twelve bonds constituted the entire number of the issue by the defendant, and that the plaintiffs owned the bonds and coupons, by the purchase of them in good faith. The defendant, for plea, averred that it did not make the bonds or the coupons, nor was any person authorized to make the same for it, and that the coupons were not its act and deed. The plaintiffs, for replication to the plea, averred that theretofore, in the Chancery Court for the county of Gibson, in Tennessee, the defendant instituted suit against the payee of the bonds, and certain other persons, holders thereof, by filing its bill in said Chancery Court against the Mississippi Central Railroad Company, H. S. McComb, and others, alleging that the bonds were invalid, and praying to have the same so adjudged, and to be surrendered to the defendant and cancelled; that thereafter, in January, 1875, in said Chancery Court, a final decree was rendered adjudging that the bonds and coupons were valid obligations against the Town of Milan; and that, therefore, the matter was *res adjudicata.* The defendant put in a rejoinder to the replication, averring that the decree referred to was procured by combination and fraud between the vice-president of the New Orleans, St. Louis, and Chicago Railroad Company, and the agents and attorneys of the defendant, by which a decision of the court in the cause, upon the matters involved, was prevented, and the decree was consented to for the purpose of giving it effect as *res adjudicata,* upon points in litigation not honestly contested; that the decree was not the judgment of the court on the issues involved, but was founded upon the unauthorized consent of certain agents and attorneys of the

defendant, who had no power to give such consent or to bind the defendant in the premises; that the court had no power to bind the defendant by the decree; that the decree was not rendered in favor of a party to the record, but in the interest of a stranger thereto; and that the plaintiffs were not *bona fide* holders, without notice, of the bonds or the coupons. The plaintiffs demurred to the rejoinder, alleging various causes of demurrer. The demurrer was overruled, and the plaintiffs then took issue upon the rejoinder.

The case was then tried by the court, on due waiver in writing of a jury. At the trial, the coupons sued on, and the bonds from which they were detached, were offered in evidence by the plaintiffs, the genuineness of the signatures being admitted. Each coupon was in the following form:

"*Town of Milan.*

"$35. Warrant for thirty-five dollars, being for six months' interest payable on the first day of July, 1880, in the city of New York, on bond No. —. "A. JORDAN,
"*Mayor of the Town of Milan, Tenn.*"

The defendant objected to the admissibility of the coupons and bonds, on the ground that they were signed, sealed, and delivered by the constituted authorities of Milan without any legislative power having been given to them, or to the defendant or its agents, to sign, seal, deliver, or issue the coupons or the bonds. The court, being of opinion that such objection was well taken, sustained it and excluded the coupons and the bonds, and the plaintiffs excepted.

There was a stipulation of facts made by the parties, which is set forth in the bill of exceptions, stipulating (1) that the bonds in question were issued by the defendant in payment of a stock subscription made by it to the Mississippi Central Railroad Company, the subscription being for the sum of $12,000; (2) that, at the time of making the subscription, the railroad company was about to extend its line from Jackson, Tennessee, to Cairo, Illinois, and the subscription was to aid in making such extension and to secure its location through

the defendant's town; (3) that such extension was completed in 1873, the same running through the town limits of the defendant, as is stipulated for, and the extension had been operated ever since that time.

The following facts also appeared by the stipulation: on the 10th of July, 1874, A. Jordan and six other persons, residents and taxpayers of the town, instituted proceedings in the Chancery Court at Humboldt, in Gibson County, Tennessee, against the Mississippi Central Railroad Company, and others, for the purpose of avoiding the liability of the town upon the bonds, the complainants constituting the board of mayor and aldermen of the town. The bill alleged, that, in the record of proceedings of the board, of the date of May 11, 1872, there was the following entry: "The board was convened by order of the mayor. Present: A. Jordan, mayor; W. M. McCall, M. B. Harris, J. H. Dickinson, J. M. Douglas, W. E. Reeves, W. H. Algea, aldermen. On motion, it was ordered that 12 bonds of $1000 each, with coupons attached, payable 20 years after issuance, bearing interest at 7 per cent. per annum, be issued by the corporation of the Town of Milan, Tenn., to the Mississippi Central Railroad Company, upon the following conditions, namely: That the Mississippi Central Railroad Company be extended from Jackson, Tenn., to the Town of Milan, and intersect or cross the Memphis and Louisville railroad at the point agreed upon by Col. Read, chief engineer of the Mississippi Central railroad, and the committee on behalf of the corporate authorities of the Town of Milan, near S. P. Clark's residence, the interest on said bonds to be paid annually, and that the town marshal open and hold an election on the 12th day of June, 1872, within the corporate limits of said town, for a ratification or rejection of said proposition;" that, in such record, were entered the following proceedings as having taken place at a meeting of said board on the 17th of June, 1872: "The board met pursuant to adjournment. Present: A. Jordan, mayor; W. M. McCall, M. B. Harris, J. M. Douglas, W. H. Algea, and W. E. Reeves, aldermen. The minutes of the former meeting were then read and adopted. The election was held on the 12th day of June, 1872, for the

ratification or rejection of the action of the board of mayor
and aldermen of the Town of Milan, in regard to the issuance
of the $12,000 in bonds to the Mississippi Central Railroad
Company upon certain conditions. The returns of said elec-
tion show a vote of 117 for subscription and 2 no subscrip-
tion;" "W. M. McCall and W. H. Algea were appointed a
committee to correspond with Judge Milton Brown, of Jack-
son, Tenn., in regard to the proposition of Milan corporation
in regard to issuing the $12,000 in bonds to the Mississippi
Central Railroad Company;" that the foregoing entries con-
stitute all the proceedings in regard to the subscription of the
$12,000 in bonds, and in regard to the election held for ratify-
ing or rejecting the action of the board in directing the issue
of the bonds; that there was nothing to show the manner in
which the election was held, or by whom the returns were
made, or that the required number of votes was polled in
favor of the proposition, as required by law; that the order of
the board directing the issue of the bonds was without author-
ity, (1) because the order was adopted and the election ordered
without any application in writing, or otherwise, to the board
for the purpose, as required by section 1144 of the Code of
Tennessee; (2) because the election was ordered to be held,
and was held, by the town marshal or constable, and not by
the sheriff of the county of Gibson, as required by section 1143
of the Code; (3) because the marshal, after the polls were
opened, and before they were closed, suffered the box in
which the votes were deposited to be removed from the place
in the town fixed for receiving ballots, to various other places
in the town, and put into the ballot-box votes offered at such
places not fixed by law as a place of voting, and without au-
thority; and (4) because, at the time, the entire line of the
contemplated road in which the stock was to be taken had not
been surveyed by a competent engineer and substantially located
by designating the termini and approximating the general
direction of the road, and no estimate of the grading, embank-
ment, and masonry had been made by any one authorized to
make it, and no such estimate as was required by section 1145
of the Code had ever been filed; that, at the time of ordering

and holding such election, the population of Milan was less than 1000 inhabitants, and, therefore, it was not authorized by law to take stock in railroads, issue bonds, or levy a tax for their payment; that, on the 23d of June, 1873, the said board made the following order: "On motion of W. M. McCall, the mayor was instructed to issue twelve bonds to the said Mississippi Central Railroad Company, of the denomination of $1000 each, with interest from date of issuance at the rate of 7 per cent per annum;" that, thereupon, said mayor prepared twelve bonds, designated as the "Bonds of the Town of Milan," of $1000 each, payable to the Mississippi Central Railroad Company, or bearer, twenty years from the date of issue, and dated July 1, 1873, bearing 7 per cent interest per annum, to which bonds were attached coupons for the payment of such interest on the 1st of July of each year the bonds had to run, each one of the bonds and coupons being signed by A. Jordan, mayor and recorder, and being made payable in the city of New York; that, on the 4th of August, 1883, the bonds and coupons were delivered to the Mississippi Central Railroad Company, through one Hall, its treasurer and cashier; that the bonds, with the coupons, one year's interest being due on July 1, 1874, were still in the possession of Hall, or some other officer or agent of the company, and the company was attempting to collect the interest due on the bonds; that the town was not bound to pay the bonds, their issue being made contrary to law, but, if the company should sell them to innocent purchasers, the town would be bound in law to pay them; that the officers of the company would sell and assign the bonds, with a view to making the town liable, if they had not already done so in part; and that they were attempting to negotiate them, and would do so unless restrained by injunction. The bill prayed that the company and its officers be enjoined perpetually from transferring or disposing of the bonds and coupons, and from collecting the same; and that they be delivered up and cancelled.

On the 10th of July, 1874, (the same day on which the bill was filed,) a temporary injunction, in accordance with its prayer, was issued. The defendants thereafter filed a de-

murrer to the bill, and, on the 9th of January, 1875, the following final decree was entered in the suit:

"A. Jordan, W. I. House, J. Q. Boyd, M. L. Baird, W. Y. Williamson, S. F. Rankin, et als., Mayor and Aldermen of the Town of Milan

*v.*

"The Mississippi Central Railroad Company, H. S. McComb, and James Hall.

"Be it remembered, that this cause, this 9th of January, 1875, came on to be heard and was heard before Hon. John Somers, chancellor, etc.; and, it appearing that this suit had been settled by the following agreement, to wit: 'Whereas the Board of Mayor and Aldermen of the Town of Milan, in Gibson County, Tennessee, having filed a bill in the Chancery Court at Humboldt against the Mississippi Central Railroad Company, to enjoin the collection of certain bonds issued by the Town of Milan to aid in the construction of said road, to wit, twelve bonds of $1000 each, with coupons attached, and said suit is now pending in said court; and whereas it is agreed by and between said corporation of the Town of Milan and the New Orleans, St. Louis and Chicago Railroad Company, into which said Mississippi Central R. R. Co. has been merged by contract of consolidation between said last-named company and the New Orleans, Jackson and Great Northern R. R. Co., that said suit be compromised as follows, to wit: The said New Orleans, St. Louis and Chicago R. R. Co. is to issue to the Town of Milan certificates of stock in the sum of $500 each, dollar for dollar, for said bonds, and the said Town of Milan on their part agrees, on receipt of said stock, to let a decree be entered in said cause in favor of the validity of said bonds, which are to be redelivered, with the seal of the town affixed, and the costs of said suit to be paid by the said New Orleans, St. Louis and Chicago R. R. Co.

"'In testimony whereof we herewith sign our names and affix our official seal, this December 18th, 1874.

"'A. JORDAN, *Mayor.*

"'A. M. WEST,

"'*2d Vice-President N. O., St. Louis & C. R. R. Co.*'

"In pursuance of this agreement, and by consent of the parties, it is ordered, adjudged, and decreed, that the New Orleans, St. Louis and Chicago R. R. Co. shall issue to the Town of Milan certificates of stock in said company, in sums of $500 each, dollar for dollar, for said twelve bonds of $1000 each, referred to in the bill; and it is further ordered, adjudged, and decreed, that, on the presentation of these certificates of stock, the Town of Milan shall have the corporate seal of said town affixed to each of said twelve bonds, and delivered to H. S. McComb, to whom they rightfully belong, or his authorized agent, and said bonds and coupons attached are declared to be valid and binding on said town and its authorities. It is, by consent, further ordered, adjudged, and decreed, that the injunction be dissolved, the demurrer herein filed be, and the same is hereby, overruled, and this decree is declared a final settlement of the right of the parties; the New Orleans, St. Louis and Chicago Railroad Company to pay the costs, and this case only retained on the docket so far as is necessary to enforce the final execution of this decree."

It was further agreed by said stipulation, that the records of the town were destroyed by fire in 1879; that no census authorized by law, of the town, had been taken before 1880, when the population was ascertained to be 1600; that the railroad was not completed to the town until after July, 1873; that, after the final decree in the Chancery Court, the plaintiffs became the owners of the bonds and the coupons attached, purchasing the same for value and before they were due; and that, in the proposition submitted to the voters of the town, the question of subscribing $12,000 to the stock of the railroad company, payable in the bonds, "was also submitted in one question and at one and the same time, and was so approved by the requisite majority."

The bill of exceptions stated that the plaintiffs offered in evidence the above named record of the Chancery Court at Humboldt, found in the stipulation; that the defendant, waiving all other objections, objected to the same because the record showed upon its face that it was not binding in law upon the town as a matter of adjudication, and, therefore, did

not sustain the replication to the plea; that the court sustained the objection and the plaintiff excepted; and 'that the court found, as one of the facts to support its judgment, that, at the time the bonds and coupons were issued, the town did not contain 1000 inhabitants.

The court found that the facts and the law were with the defendant, and rendered a judgment in its favor, for the costs of the suit, to review which the plaintiffs have brought a writ of error. The opinion of the Circuit Court is reported in 21 Fed. Rep. 842.

*Mr. Holmes Cummins* and *Mr. J. B. Henderson* for plaintiffs in error cited : *Humboldt Township* v. *Long*, 92 U. S. 642 ; *Marcy* v. *Oswego*, 92 U. S. 637 ; *Moultrie County* v. *Rockingham Savings Bank*, 92 U. S. 631 ; *Walnut Township* v. *Wade*, 103 U. S. 683 ; *Oregon* v. *Jennings*, 119 U. S. 74, 95 ; *Pana* v. *Bowler*, 107 U. S. 529 ; *Harter* v. *Kernochan*, 103 U. S. 562 ; *Anthony* v. *Jasper County*, 101 U. S. 693 ; *Dixon County* v. *Field*, 111 U. S. 83 ; *Buchanan* v. *Litchfield*, 102 U. S. 278 ; *Northern Bank* v. *Porter Township*, 110 U. S. 608 ; *Lynde* v. *The County*, 16 Wall. 6 ; *Commissioners* v. *January*, 94 U. S. 202 ; *Coloma* v. *Eaves*, 92 U. S. 484 ; *Commissioners* v. *Bolles*, 94 U. S. 104 ; *County of Warren* v. *Marcy*, 97 U. S. 96 ; *Johnson* v. *Stark County*, 24 Illinois, 75 ; *Clay* v. *Hawkin's County Justices*, 5 Lea, 137 ; *Meyer* v. *Muscatine*, 1 Wall. 384 ; *Flagg* v. *Palmyra*, 33 Missouri, 440 ; *Supervisors* v. *Galbraith*, 99 U. S. 214 ; *Milan* v. *Tennessee Central Railroad*, 11 Lea, 329 ; *Adams* v. *Memphis & Little Rock Railroad Co.*, 2 Coldwell, 645 ; *Louisville & Nashville Railroad* v. *Tennessee*, 8 Heiskell, 663, 780 ; *McCallie* v. *Chattanooga*, 3 Head, 317 ; *Seybert* v. *Pittsburgh*, 1 Wall. 272 ; *Nichol* v. *Nashville*, 9 Humphrey, 250 ; *Gifford* v. *Thorn*, 9 N. J. Eq. (1 Stockton) 702 ; *Green* v. *Hamilton*, 16 Maryland, 319 ; *Olcott* v. *Supervisors*, 16 Wall. 678 ; *Ohio Life Ins. Co.* v. *Debolt*, 16 How. 416, 432 ; *The City* v. *Lamson*, 9 Wall. 477, 485 ; *Douglass* v. *County of Pike*, 101 U. S. 677 ; *Taylor* v. *Ypsilanti*, 105 U. S. 60 ; *New Buffalo* v. *Iron Company*, 105 U. S. 73 ; *Corpenning* v. *Kincaid*, 82 Nor. Car. 202 ; *Wood*

v. *Raymond*, 42 California, 643 ; *Hillsborough* v. *Nichols*, 46 N. H. 379 ; *Miller* v. *Sherry*, 2 Wall. 237 ; *Lee* v. *Kingbury*, 13 Texas, 68 ; *S. C.* 62 Am. Dec. 546 ; *Larson* v. *Reynolds*, 13 Iowa, 579 ; *S. C.* 81 Am. Dec. 444 ; *Wilson* v. *Stripe*, 4 Greene (Iowa), 551 ; *S. C.* 61 Am. Dec. 138 ; *Luckett* v. *White*, 10 G. & J. 480 ; *Atkins* v. *Faulkner*, 11 Iowa, 326 ; *Platt* v. *Judson*, 3 Blackford, 235 ; *Brown* v. *Mayor*, 66 N. Y. 385 ; *Jarvis* v. *Driggs*, 69 N. Y. 143 ; *Newton* v. *Hook*, 48 N. Y. 676 ; *Gates* v. *Preston*, 41 N. Y. 113 ; *White* v. *Merritt*, 3 Selden, 352 ; *S. C.* 57 Am. Dec. 527 ; *Cromwell* v. *Sac Co.*, 94 U. S. 351, 356, 357 ; *Tadlock* v. *Eccles*, 20 Texas, 782 ; *S. C.* 73 Am. Dec. 213 ; *Dillard* v. *Harris*, 2 Tenn. Ch. 193 ; *Mayo* v. *Harding*, 3 Tenn. Ch. 237 ; *Greenlaw* v. *Kernahan*, 4 Sneed, 371 ; *Winchester* v. *Winchester*, 1 Head, 500 ; *Hoffer* v. *Fisher*, 2 Head, 253 ; *McGovach* v. *Bell*, 3 Coldwell, 512 ; *Kindell* v. *Titus*, 9 Heiskell, 727 ; *Jones* v. *Williamson*, 5 Coldwell, 371 ; *Williams* v. *Neil.* 4 Heiskell, 279.

*Mr. Sparrel Hill* for defendants in error cited : *Milan* v. *Tennessee Central Railroad Co.*, 11 Lea, 330 ; *Green* v. *Dyersburg*, 2 Flippin, 477 ; *Albany & Susquehanna Railroad* v. *Mitchell*, 45 Barbour, 208 ; *Marsh* v. *Fulton County*, 10 Wall. 676 ; *Wells* v. *Supervisors*, 102 U. S. 625 ; *Claiborne County* v. *Brooks*, 111 U. S. 400 ; *Mayor* v. *Ray*, 19 Wall. 468 ; *Floyd's Acceptances*, 7 Wall. 666 ; *Northern Bank* v. *Porter*, 110 U. S. 608 ; *Buchanan* v. *Litchfield*, 102 U. S. 278 ; *Manhattan Ins. Co.* v. *Broughton*, 109 U. S. 121 ; *Russell* v. *Place*, 94 U. S. 606 ; *Allen* v. *Richardson*, 9 Rich. Eq. 53 ; *Dillard* v. *Harris*, 2 Tenn. Ch. 193 ; *Hartfield* v. *Simmons*, 12 Heiskell, 255 ; *Gay* v. *Parpart*, 106 U. S. 679 ; *Parkhurst* v. *Sumner*, 23 Vermont, 538 ; *S. C.* 56 Am. Dec. 94 ; *Mitchell* v. *Kintzer*, 5 Penn. St. 217 ; *S. C.* 47 Am. Dec. 408.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

Two questions arise for consideration in this case, (1) as to the statutory authority for the issue of the bonds; (2) as to the effect of the decree of January 9, 1875, in the suit in the state court of Chancery.

The bonds in question were issued in payment of a subscription made by the town to the stock of the Mississippi Central Railroad Company. On their face, they do not recite any such subscription to stock, but recite, as the consideration for the bonds, the "location of the Mississippi Central railroad by said town." It is well settled, that a municipal corporation, in order to exercise the power of becoming a stockholder in a railroad corporation, must have such power expressly conferred upon it by a grant from the legislature; and that even the power to subscribe for such stock does not carry with it the power to issue negotiable bonds in payment of the subscription, unless the power to issue such bonds is expressly or by reasonable implication conferred by statute. Such is the law as recognized by the Supreme Court of Tennessee, in the case of *Pulaski* v. *Gilmore*, decided in 1880, and published in 21 Fed. Rep. 870, and in *Taxpayers of Milan* v. *Tennessee Central Railroad*, 11 Lea, 330, decided in 1883. Such is also the law as established by this court. *Marsh* v. *Fulton County*, 10 Wall. 676; *Wells* v. *Supervisors*, 102 U. S. 625; *Ottawa* v. *Carey*, 108 U. S. 110, 123; *Daviess County* v. *Dickinson*, 117 U. S. 657, 663.

The grant of authority to a municipal corporation to subscribe for the stock of a railroad company does not carry with it the power to issue negotiable bonds to pay for the subscription, or anything more than the power to raise money by taxation to pay the amount of the subscription. If, in the statute granting the power to subscribe for the stock, no manner of paying the subscription is provided for, it cannot be paid by issuing negotiable bonds. The practice in Tennessee, as shown by its statute books, has been to authorize expressly the issuing of negotiable bonds by municipal corporations to pay for subscriptions to stock, in all cases where it was desired to confer upon such corporations the power to issue such bonds.

By a statute passed in 1852, and carried into the Code of Tennessee of 1857–8, (sections 1142 to 1161,) in force when the bonds in this case were issued, any county, incorporated town, or city was authorized (section 1142) to subscribe for

stock to a specified amount of its taxable property "in rail-roads running to or contiguous thereto," upon certain specified terms and conditions. An election was to be held (section 1143) when ordered (section 1144) in a specified manner, after the entire line of the road (section 1145) had been surveyed, and a certain estimate of the grading, embankment, and masonry had been made, and after a specified notice of the election (section 1146) had been given. The statute (section 1147) prescribed the form of the vote, and, provided (section 1148) that the subscription should be made if a majority of the votes cast should be in favor of it. Sections 1150, 1154, 1155, 1156, 1157, 1160, 1161, provided as follows:

"1150. As soon as the stock is subscribed, it is the duty of the county court, or corporate authorities, to levy a tax upon the taxable property, privileges and persons, liable by law to taxation within the county or corporation limits, sufficient to meet the instalments of subscription as made, and the cost and expenses of collection, which tax shall be levied and collected like other taxes."

"1154. Not more than thirty-three and one-third per cent of the stock subscribed as above can be collected in any one year.

"1155. The tax-collector, as fast as he makes collections, shall pay the amounts over to the company.

"1156. He shall also, as he receives the tax, give to each taxpayer a certificate in such form as the railroad company may prescribe, showing the amount of such tax paid by him, of which he shall retain a duplicate to be delivered to the president of the railroad company, and such certificate is negotiable by delivery or assignment, and, with a deduction of its proportion of the cost of collection, is receivable in payment of either freight or passage on the railroad in which the subscription is taken, after the expiration of one year from the completion of such road.

"1157. The holder of such certificates to the amount of one share or more of the stock of such railroad company, is entitled to demand and receive from the company in lieu thereof, a certificate of stock in the capital stock of such company, which will give him all the privileges of any other stockholder."

" 1160. For the purpose of meeting unexpected contingencies, the county or corporation authorities may anticipate the collection of the railroad tax by the issuance of warrants, bearing six per cent interest, and payable at such times as may be desired by the railroad company, the warrants to be received as payment of so much stock.

" 1161. In such a case a sufficiency of the railroad tax shall be paid into the county treasury to meet the warrants as they fall due."

These provisions of the statute do not contemplate or authorize the issue of negotiable bonds. They provide distinctly for the levying of a tax to meet the instalments of the subscription. Section 1160, in authorizing the issuing of warrants made payable at such times as may be desired by the railroad company, and to be received by it in payment for the stock, only contemplates that the warrants shall be issued in anticipation of the collection of the tax, which, under the provisions of section 1154, may be entirely collected in three years, but cannot be collected more rapidly than one-third in each year; and there is no implication that any warrants are to be issued except to anticipate the collection of a tax, after such tax is levied under the provisions of section 1150, and such levy is to be made as soon as the stock is subscribed for, and is to be the levy of a tax sufficient to meet the instalments of subscription as made, and the costs and expenses of collection, subject to the provision of section 1154, that, although the levy of the tax is made, not more than one-third of the stock subscription can be collected in any one year. It is solely to anticipate the collection of the tax, when it is collectible by virtue of the terms of the levy, that the warrants are authorized, by section 1160, to be issued; and there is nothing in the statute which contemplates that the warrants shall be made payable at any time later than the time fixed for the collection of the instalments of the tax. These provisions exclude the power of issuing such negotiable bonds as were issued in this case.

It is contended by the plaintiffs that express authority for issuing the bonds in question is to be found in an act of the legislature of Tennessee, approved January 23, 1871, being

chapter 50 of the Acts of 1870–71. ' In 1870, a new constitution was adopted in Tennessee, section 29 of Article II. of which reads as follows :

" Sec. 29. The general assembly shall have power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law ; and all property shall be taxed according to .its value, upon the    principles established in regard to state taxation.    But the credit of no county, city, or town shall be given or loaned to or in aid of any person, company, association, or corporation, except upon an election to be first held by the qualified voters of such county, city, or town, and the assent of three-fourths of the votes cast at said election.    Nor shall any county, city, or town become a stockholder with others in any company, association, or corporation, except upon a like election and the assent of a like majority.    But the counties of Grainger, Hawkins, Hancock, Union, Campbell, Scott, Morgan, Grundy, Sumner, Smith, Fentress, Van Buren, White, Putnam, Overton, Jackson, Cumberland, Anderson, Henderson, Wayne, Marshall, Cocke, Coffee, Macon, and the new county herein authorized to be established out of fractions of Sumner, Macon, and Smith counties, and Roane, shall be excepted out of the provisions of this section, so far that the assent of a majority of the qualified voters of either of said counties voting on the question shall be sufficient, when the credit of such county is given or loaned to any person, association, or corporation : *Provided*, That the exception of the counties .above named shall not be in force beyond the year one thousand eight hundred and eighty, and after that period they shall be subject to the three-fourths majority applicable to the other counties of the State."

The act approved January 23, 1871, was entitled " An act to enforce article 2, § 29, of the Constitution, to Authorize the Several Counties and Incorporated. Towns in this State to impose Taxes for County and Corporation Purposes."    It read as follows :

" Section 1. *Be it enacted by the General Assembly of the*

*State of Tennessee,* That the several counties and incorporated towns in this State may, and are hereby authorized to impose taxes for county and corporation purposes, respectively, in the following manner and upon the following conditions:

" 1st.  That all taxable property shall be taxed according to its value, upon the principles established in regard to state taxation.

" 2d.  The credit of no county, city, or town shall be given or loaned to, or in aid of any person, company, association, or corporation, except, first, upon the consent of a majority of the Justices of the Peace of the county, at a Quarterly Term of the County Court of such county, or a majority of the Board of Mayor and Aldermen, as the case may be, of such city or town, and upon an election afterwards held by the qualified voters of said county, city, or town, and the assent of three-fourths of the votes cast at said election.  The said County Court, or Board of Mayor and Aldermen, as the case may be, shall spread upon their records the proposition and the amount to be voted upon by the people, and shall have full power to hold and conduct such elections according to the laws regulating elections in this State; and if the assent of three-fourths of the voters of such county, city, or town, is had, then the County Court or Board of Mayor and Aldermen, as the case may be, shall have full power to make and execute all necessary orders, bonds, and payments, in order to carry out such loan or credit voted for as prescribed in this act; nor shall any county, city, or town become a stockholder with others in any company, association, or corporation, except upon a like election, and the assent of a like majority, as prescribed in this Act."

Section 2 of the act enacts the constitutional exception as to the specified counties.

This act was manifestly passed for the object stated in its title, to carry into effect the provisions of section 29 of article 2 of the constitution of 1870, and to prescribe the manner and the conditions, in conformity with the provisions of that section, in and upon which the several counties and incorporated towns in the State should have the right to impose

taxes for county and corporation purposes. The second clause of the first section of the act only provides, in the language of the constitution, that "the credit of no county, city, or town shall be given or loaned to or in aid of any person, company, association, or corporation, except" upon the assent of three-fourths of the votes cast at an election held by the qualified voters of the county, city, or town. The clause then goes on to provide, in the exact language of the constitution, as follows: "Nor shall any county, city, or town become a stockholder with others in any company, association, or corporation, except upon a like election and the assent of a like majority."

The enactments in that clause are entirely inhibitory and negative in their character. They do not confer any authority for the giving or loaning of credit upon any municipality, nor confer the right upon any municipality to become a stockholder with others in any corporation; but they only prescribe the condition, that no credit shall be given or loaned, and no ownership of stock be created, unless the prescribed election be first held and the assent of three-fourths of the votes cast at it be first given. But the authority to give or loan credit, and to become a stockholder, under the conditions prescribed in the act of 1871, must be found in an independent grant of authority, in some other statutory provision, either general or special. These were the views taken by the Supreme Court of Tennessee, in the case of *Pulaski* v. *Gilmore*, before cited. (See, also, *Taxpayers of Milan* v. *Tennessee Central Railroad*, *supra*.)

It is further contended, that authority to issue the bonds was given by an act of the legislature of Tennessee, approved March 23, 1872, chapter 20 of the Acts of 1872, entitled, "An act to Authorize the Mayor and City Council, or Mayor and Board of Aldermen, of any Incorporated City or Town in the State of Tennessee having a Population of from One Thousand and upwards to Twenty Thousand Inhabitants, to issue Bonds of said City or Town to the amount of Fifteen Thousand Dollars." That act is as follows:

"SEC. 1. *Be it enacted by the General Assembly of the State*

*of Tennessee*, That the Mayor and City Council or the Board of Mayor and Aldermen of any incorporated city or town in the State of Tennessee, having a population of from one thousand to twenty thousand, are hereby authorized in their corporate capacity to issue the bonds of the said city or town, signed by the Mayor and countersigned by the Recorder of said city or town, with coupons for interest attached, to an amount not exceeding Fifteen Thousand Dollars. The Bonds herein provided for may be executed of denominations from Twenty-five to Five Hundred Dollars, at discretion of said Mayor and City Council or Mayor and Aldermen, and to mature at such times as may be fixed by said Mayor and City Council or Mayor and Aldermen, from one to twenty years after date, and bearing interest at the rate of eight per cent per annum, payable semi-annually ; the past-due coupons on which bonds shall be receivable for taxes, and all other dues to the corporation issuing the same: *Provided*, That the bonds issued under the provisions of this Act shall be alone for the purpose of paying outstanding liabilities against the city or corporation issuing them, and shall not in any case exceed the unsettled and matured liabilities or debts of such city or corporation at the time of issuance thereof ; but in no event shall the bonds be issued without the consent of three-fourths of the qualified voters voting at an election to be held for that purpose under the supervision of said Mayor and City Council or Board of Aldermen.

" SEC. 2. *Be it further enacted*, That the said Mayor and City Council or Mayor and Aldermen of said city or town are hereby authorized to issue at par such coupon bonds as are provided for in this Act, to the holders of bona fide claims against said city or town, in liquidation and discharge of such claims and interest thereon, and to such others as are willing to take them at par, not to exceed in amount said sum of fifteen thousand dollars: *Provided*, That in no case shall said Mayor and City Council or Mayor and Aldermen of said city or town, as the agent for that purpose, sell under their par value any of the bonds the issuance of which is authorized by this act: *Provided further*, That the proposed rate of interest

the bonds are to bear shall be specified and submitted to the vote of the inhabitants of such corporations, at the time the election is held in regard to the issuance of the bonds."

By the express provision of section 1 of this act, the bonds to be issued under it are to " be alone for the purpose of paying outstanding liabilities against the city or corporation issuing them;" and it is provided that they " shall not in any case exceed the unsettled and matured liabilities or debts of such city or corporation at the time of issuance thereof;" and, by section 2, they are to be issued "to the holders of bona fide claims against said city or town, in liquidation and discharge of such claims and interest thereon, and to such others as are willing to take them at par."

We are of opinion that this statute has no application to the present case. Its object was manifestly to enable certain incorporated cities and towns to fund their matured debts, by issuing bonds of the character specified in the act. The debts for which they were to be issued were not only to be unsettled debts, but matured debts, and the bonds were not to be issued in any event without the consent of three-fourths of the qualified voters voting at an election to be held for the purpose. When the election in the present case was held, no debt created by any subscription to any stock had yet been incurred; and it is expressly stipulated, in the agreed statement of facts, that the question of subscribing $12,000 to the stock of the company, and the question of paying such subscription in bonds, were submitted to the voters as a single question, at one and the same time, and were approved by the same vote. Indeed, from the record of the proceedings of the board of mayor and aldermen of the town, there does not appear to have been any submission to the voters of the question of subscribing to the stock of the railroad company, or of issuing the bonds in payment for any such subscription, but only the question of whether the bonds should be issued by the town to the company as a donation or subscription of bonds; and the bonds themselves, on their face, carry out only the same idea. Still, it is agreed that the bonds were issued in payment of a "stock subscription" made by the town to the railroad

company. But, even in that view, the liability on the subscription to the stock was not such a matured liability or debt of the town, at the time the election was held, as the act of 1872 refers to. The vote of the people was, at most, a vote to subscribe for the stock. The terms of the vote appear to have been " For subscription," or " No subscription." The vote to subscribe for the stock and the vote to issue the bonds were one and the same vote, comprehended in the words " For subscription." In order to make the liability for the subscription a " matured " liability of the town, it was necessary that the subscription should be actually made, in pursuance of the vote, and that the terms for paying the money in discharge of it should be determined, and that an election should be thereafter held to vote in regard to issuing bonds for the liability, as a matured liability, and in view of all the terms and circumstances of such liability. No such election was held after any liability for the subscription became a matured liability.

In regard to the effect of the decree of the Chancery Court, of January 9, 1875, it is to be said, that it was made in a suit by the town authorities to enjoin perpetually the collection of the bonds, on the ground that they were issued without authority of law. By the decree it was ordered, by consent of the parties, that the preliminary injunction should be dissolved and the demurrer be overruled. This left the bill to stand as it was originally filed. The decree sets forth that the suit had been settled by an agreement, a copy of which is embodied in the decree. That agreement refers to the bonds as having been issued by the town " to aid in the construction of said road," that is, the road of the Mississippi Central Railroad Company. It does not refer to the bonds as having been issued in payment of a subscription to the stock of the company. It then sets forth that it has been agreed by the town and the New Orleans, St. Louis and Chicago Railroad Company, (into which the Mississippi Central Railroad Company had been merged, by contract of consolidation between the last-named company and the New Orleans, Jackson and Great Northern Railroad Company,) that the suit

should be compromised by the issue, by the New Orleans, St. Louis and Chicago Railroad Company, to the town, of certificates of stock, in the sum of $500 each, dollar for dollar, for the $12,000 of bonds, the town agreeing, on the receipt of the stock, to let a decree be entered in the cause in favor of the validity of the bonds, which were to be redelivered, with the seal of the town affixed, and the costs of the suit were to be paid by the New Orleans, St. Louis and Chicago Railroad Company.

The substance of this is that, on the bill, it standing good, with the demurrer to be overruled, the plaintiffs agree, notwithstanding the averments of the bill, that the bonds are valid. The decree then states, that, in pursuance of that agreement and by consent of the parties, it is decreed, that the New Orleans, St. Louis and Chicago Railroad Company shall issue to the town the certificates of stock in the company referred to in the agreement; that, on the presentation of those certificates, the town shall have its corporate seal affixed to each of the twelve bonds; and that the bonds and their coupons are declared to be valid and binding on the town and its authorities.

This was no adjudication by the court of the validity of the bonds, on the submission to it, as a judicial tribunal, of the question of such validity. The declaration of the validity of the bonds, contained in the decree, was made solely in pursuance of the consent to that effect contained in the agreement signed by the mayor of the town and the officer of the New Orleans, St. Louis and Chicago Railroad Company. The act of the mayor, in signing that agreement, could give no validity to the bonds, if they had none at the time the agreement was made. The want of authority to issue them extended to a want of authority to declare them valid. The mayor had no such authority. The decree of the court was based solely upon the declaration of the mayor, in the agreement, that the bonds were valid; and that declaration was of no more effect than the declaration of the mayor, in the bill in chancery, that the bonds were invalid.

The adjudication in the decree cannot, under the circum-

stances, be set up as a judicial determination of the validity of the bonds. (*Russell* v. *Place*, 94 U. S. 606; *Manhattan Life Ins. Co.* v. *Broughton*, 109 U. S. 121, 125.) This was not the case of a submission to the court of a question for its decision on the merits, but it was a consent in advance to a particular decision, by a person who had no right to bind the town by such a consent, because it gave life to invalid bonds; and the authorities of the town had no more power to do so than they had to issue the bonds originally.

There is nothing inconsistent with this view in *Nashville &c. Railway Co.* v. *United States*, (113 U. S. 261,) where it was held, that a decree in equity, by consent of parties, and upon a compromise between them, was a bar to a subsequent suit upon a claim therein set forth as among the matters compromised and settled, although not in fact litigated in the suit in which the decree was rendered. In that case both parties had full power to make the compromise involved.

*The judgment of the Circuit Court is affirmed.*