# THE WASHINGTON MARKET COMPANY
## *v.*
# THE DISTRICT OF COLUMBIA.

WASHINGTON MARKET CO.; WHOLESALE MARKET; MUNICIPAL CONTRACTS; MUNICIPAL OFFICERS, POWERS OF.

1. Sec. 16 of the act of Congress of May 20, 1870, incorporating the Washington Market Co. conferred no power on that company to use or make regulations governing the use of the space of ground near the Center Market, known as the Wholesale Market, but did confer such power on the municipal authorities of this District.

2. It was beyond the power of the Governor and Board of Public Works of the District to make a valid contract with the Washington Market Company for the use of such space, and their permission to the company to use it and acquiescence in its use could not operate to estop the present District government from retaking possession of and exercising control over such space.

3. The power of the officers and agents of a public corporation to make contracts binding on the corporation, is to be strictly construed.

No. 374.  Submitted March 5, 1895.  Decided April 1, 1895.

HEARING on an appeal by the complainant from a decree dismissing a bill in equity for the ascertainment of a contract and for an accounting and an injunction.  *Affirmed.*

The COURT in its opinion stated the case as follows:

The bill in this case was filed by the Washington Market Co. against the District of Columbia, setting up a contract with the District, under the charter powers of the complainant, authorizing it to manage and control certain ground in the city of Washington, called the Wholesale Market. The prayers are:

1. That the said contract may be ascertained and declared.

2. That an account may be taken of the losses of revenue to complainant from unlawful interference with its rights, whereby its revenues were diminished, and for a decree therefor.

3. That the defendant be restrained from attempting to prescribe rules and regulations for said Wholesale Market, from interfering with complainant's revenues therefrom, and from attempting to obtain possession thereof by force or by action at law.    Answer was filed, evidence taken, and upon hearing, the bill was dismissed.

The Washington Market Company was incorporated May 20, 1870, by act of Congress.    16 Stat. pp. 124–133.    The right of possession and use of the Central Market grounds, for ninety-nine years, was vested in the said company, and it was authorized and required to erect certain buildings thereon and to collect revenues for their use as a market.

This ground lies near the south side of Pennsylvania avenue, and between Seventh and Ninth streets, west, and is what has been known as the "Center Market" since 1802. The open space described in section 16 is separate and distinct therefrom.

The only section of the act aforesaid which requires construction here, or about which there is any controversy, is section 16, which reads thus :

" SEC. 16.  That the city government of Washington shall have the right to hold and use under such rules and regulations as the said corporation may prescribe, the open space at the intersection of Ohio and Louisiana avenues with 10th and 12th streets, as a market for the purchase and sale of the following articles, to wit, hay, straw, oats, corn, cornmeal, seed of all kinds, wood for sale from the wagon, cattle on the hoof, swine on the hoof, country produce sold in quantities from the wagon, and such other bulky and coarse articles as the said corporation may designate   *   *   * marketing of the products named herein shall be excluded from Pennsylvania and Louisiana avenues and the sidewalks and pavements thereon."

At the date of said act, Washington was governed by a mayor and council under an old charter conferring the usual powers over streets, markets, etc.

February 21, 1871, the act of Congress was passed creating a new government for the District of Columbia, the various powers of which were conferred upon a Governor and a Legislative Assembly, assisted by a Board of Public Works, of which the Governor was *ex officio* the President. See R. S. D. C., sections 2 to 96.   (16 Stat. 423 *et seq.*)

After taking possession of the grounds given it by its charter, the complainant claimed the right to control and manage the open space designated as a Wholesale Market by said sixteenth section, and on November 8, 1871, addressed the following letter to the Governor of the District:

"WASHINGTON MARKET Co., November 8, 1871.

" Hon. Henry D. Cooke, Governor of the District of Columbia:

" Sir :—In section 16 of the charter of this company of May 20, 1870, the open space at the intersection of Ohio and Louisiana avenues with Tenth and Twelfth streets is assigned as a market for cattle and bulky and coarse articles to be sold in quantities from the wagon, and the marketing of such products in Pennsylvania and Louisiana avenues is prohibited.

" Notwithstanding this prohibition dealers are continuing to occupy Louisiana avenue in defiance of law and to the great injury of property holders on that avenue.   This company has been unable to enforce the prohibition because the open space above referred to has not been properly prepared to enable dealers to occupy the grounds for market purposes as provided in the law.

" By the act of Congress the Washington Market Company is entitled to establish the rules and regulations which shall govern the market upon the open space, but it is a question whether or not it was the intention of Congress that this company should derive any income therefrom.

" Under these circumstances, to meet a pressing public

necessity, this company proposes, with your permission, properly to grade the grounds and to place thereon suitable platforms of inexpensive construction, which will enable the marketmen to do business on the open space as contemplated by the act, charging them for the use of their stands such sums as you and the District authorities may prescribe, not to exceed the interest on the actual outlay and the actual expenditures for keeping the market in order.

" There can be no possible objection to this course of action, and we trust you will give it your approval at once, as there is a necessity for immediate action.

"We have the honor to be, very respectfully,

"T. C. CONNELLY,

"HALLET KILBOURN,

"ADOLF CLUSS,

" WM. E. CHANDLER,

"*Committee of the Washington
Market Company.*"

Upon this letter the following indorsement appears : "Approved, subject to such regulations as the Legislative Assembly may hereafter prescribe.    (Signed), H. D. Cooke, Governor."

No action was ever had by the Assembly and there is nothing to show that it was ever brought to its attention.

On April 8, 1872, the following communication was addressed to the Governor and Board of Public Works:

" WASHINGTON MARKET Co., April 8, 1872.

" To the Governor and Board of Public Works of the District of Colnmbia : The Washington Market Company is now in possession of the open space at the intersection of Ohio and Louisiana avenues with Tenth and Twelfth streets, in accordance with the sixteenth section of the act of Congress of May 20, 1870, and the agreement made with the Governor of the District, as per arrangement of November 8, 1871, as follows : (For letter of November 8, 1871, see above in the this opinion).    Since taking possession of the open space thus assigned for a wholesale market the company have purchased

from the District authorities the buildings thereon belonging to the city of Washington; have suitably graded the surface, and have also commenced the erection of structures thereon necessary for wholesale market purposes, having already completed an open market or platform shed on the north side of B street over 200 feet long; also an open platform shed 200 feet long on the north side of the grounds, with eating house and storehouses, and have, in addition, made arrangements to erect a large open building for loads of hay, grain and wood, and suitable stables, pens and cattle yards, as soon as the concrete paving company, now occupying the western portion of said ground, shall vacate the same; all to be done to the satisfaction of the District authorities and in such manner as to furnish creditable accommodations for a wholesale market.

"In order to more effectually carry out the foregoing arrangement, entered into November 8, 1871, the company now propose to the Governor and to the Board of Public Works, which by law has control of the streets and avenues of the District, that the said company shall be allowed to collect of dealers in said wholesale market the following sums: Each one-horse team, per day, $0.10; each two-horse team, .15; each three-horse team, .20; each four-horse team, .25; each head of neat cattle, .20; each cow and calf, .25; each swine, .05; each sheep, .05.

"The market company also to charge such reasonable rent for storage as may be agreed upon with the parties using their buildings.

"The company will also keep an office open at all hours of the day and night for the accommodation of dealers, where produce can be measured and weighed, and will furnish suitable watchmen to take charge of the market and collect the revenues thereof.

"From the revenues collected the market company will retain sufficient to pay all expenses of managing and keeping in repair and good condition the buildings and grounds, with ten per cent. annually on the cost of improvements

(which are to be made at the company's charge), and the company shall pay over to the District authorities the residue or balance of the revenue by them collected.

"If, by authority of Congress, the company should at any time be dispossessed of the use and occupancy of the market grounds, it shall be entitled to receive a fair compensation for its buildings and improvements thereon.

"WASHINGTON MARKET COMPANY,
                    "By M. G. EMERY,
                                    *President."*

Nothing more seems to have been done until April 26, 1874, when the following letter was received by the Market Company:

"BOARD OF PUBLIC WORKS,
            "DISTRICT OF COLUMBIA,
                    "WASHINGTON, *April 26, 1874.*

"The Washington Market Company:

"In reply to your communication of April 8, 1872, I have to inform you that the board have this day passed the following vote: To approve the arrangement with the Washington Market Company, proposed in the company's letter of April 8, 1872, relative to the open space at the intersection of Ohio and Louisiana avenues and Tenth and Twelfth streets, used as a wholesale market; this arrangement not to prejudice any lawful future action of the Board, of the Legislative Assembly, or of Congress.

"Very respectfully,
            "ALEX. R. SHEPHERD, *Vice-President."*

These letters are not found in the records of the District, and there is no minute of action taken thereon by either the Legislative Assembly or the Board of Public Works.

Complainant introduced evidence to show that it had filled and graded the said grounds and erected wooden buildings and sheds thereon, which were used for market purposes under its regulations, and for which use it had collected revenues. It was also shown that the District Commissioners had interfered with their management, and had

finally demanded possession and threatened ejectment proceedings.

A claim for the sum of $27,167.02 was made out against the District in August, 1893, for erection of buildings, expenses, interest, etc.

*Mr. William Birney* for the appellant:

1. The record shows that, for nearly 21 years, the contract between the plaintiff and the District authorities had been executed and had been acquiesced in by the Board of Public Works, the Legislative Assembly, Congress, and the Commissioners and attorneys of the District. Its legality was first questioned October 16, 1891. The contract was based upon the then received interpretation of the organic act of 1871. The contemporaneous construction of the law must govern. *Packard* v. *Richardson*, 17 Mass. 143; *Cohens* v. *Virginia*, 6 Wheat. 418; *McKeen* v. *De Lancy*, 5 Cr. 22; *Havermeyer* v. *Supervisors*, 70 U. S. 294; *Brown* v. *United States*, 113 U. S. 568; *Topliff* v. *Topliff*, 122 U. S. 121; 11 Am. and Eng. Ency. of L. 519.

2. The Governor of the District had the legal right to make the arrangement of November 8, 1871.

3. The Board of Public Works had the legal right to make the arrangement of April 8, 1872.

4. A court of equity will not permit the defendant, which has received the benefits of the contract, to impeach it for want of authority in the Board of Public Works to make it, or for informalities. Such a contract was not forbidden in the organic act, and it had been recognized by the District authorities in a course of dealing continued for 21 years with the plaintiff and third parties. *Taylor* v. *Chichester*, L. R. 2 Ex. 356; *Railroad Co.* v. *Stewart*, 3 Macq. 382; *Railroad Co.* v. *Hawkes*, 5 H. L. Cases, 381; see also *Riche* v. *Railway Co.*, L. R. 9 Exch. 224; *Campbell* v. *District of Columbia*, 2 MacA. 533.

5. The plaintiff has a right in the nature of lien for all proper expenditures and advances in and about the prop-

erty entrusted to its agency. This right is a lien on personal property. Story on Agency, sec. 373 ; *Lovett,* 40 N. H. 511 ; *Wilson,* 40 N. H. 88 ; *Muller,* 55 N. Y. 326 ; *Farrington,* 30 Miss. 578 ; *Nevan,* 8 Iowa, 207 ; *United States Express Co.,* 67 Ill. 1, 40; 1 Pom. Jur., sec. 390; see *Powell* v. *Thomas,* 6 Hare, 300 ; *Ramsden* v. *Dyson,* L. R. 1 H. L. 129.

In *Ramsden* v. *Dyson,* L. R. 1 H. L., it is said : " If tenant at will builds on land, in belief that he thereby acquires title afterwards to claim a lease of land, and landlord allows him so to build, knowing that he is acting in that belief, and does not interfere to correct error, *semble,* that equity will interfere to compel grant of lease."

This describes the facts of the case at bar. The plaintiff has made advances for buildings and improvements upon defendant's property, as defendant's agent, with defendant's knowledge and acquiescence. Defendant threatens to eject plaintiff at law and seize upon the buildings and improvements without compensation. Plaintiff asks the equity court to restrain these proceedings until compensation is made. It is a plain case for relief under the general prayer of the bill. *Tayloe* v. *The Merch. F. I. Co.,* 9 How. 390 ; *Motteux's case,* 1 Atk. 545 ; *Perkins,* 4 Cowen, 645 ; 1 Duer, 66, 110 ; 2 Phillips, 583.

In this connection it is to be observed that there is no charge whatever made by the District of any neglect or default on the part of the market company or of public complaint of its management, nor is it denied that the company has fully, and in all respects, lived up to, and complied with, the obligations and duties imposed upon it, by reason of the agreement aforesaid ; and that the attempt, on the part of the District authorities, to terminate said contract relations, and dispossess the said company without making compensation is entirely arbitrary and without any just cause or reason therefor.

*Mr. S. T. Thomas,* Attorney for the District of Columbia, and *Mr. A. B. Duvall,* Assistant Attorney, for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

I. The apparent motive of the market company in claiming, and seeking to secure, the possession and control of the wholesale market place was not only to prevent possible competition, but also to obtain revenue.

Its claim was that section 16 invested it with the power " to establish the rules and regulations which shall govern the wholesale market upon the open space," granted to the municipal government. The only open or debatable question was, according to its view, " whether it was the intention of Congress that this company should claim any revenue therefrom."

We think it plain that this section will not bear the construction given it by the representatives of the market company. As is so often the case in acts of Congress, this section represents legislation concerning a thing separate and distinct from the special subject-matter of the title and body of the act in which it has been inserted. It was a distinct grant to the city government of Washington " to hold and use under such rules and regulations as the said corporation may prescribe, the open space," etc. " Said corporation" unquestionably refers to the municipal corporation, and cannot by any rule of construction, grammatical or otherwise, refer to the market company.

This claim of power over the grounds specially granted to the city is far in excess of that which the market company has over the grounds specially given to it. The section containing its own grant confers upon the municipal government " the power to make and enforce such regulations with regard to the said market and the management thereof as in their judgment the convenience, health and safety of the community may require." Moreover, it has the power to dictate the minimum prices at which stalls and privileges shall be let, and rents once fixed can only be raised on application to it and the hearing of both sides.

These limitations are proper and necessary for the pro-

tection of the people, whose representative the municipal government is, and are such as are usual in all fair and well considered legislative grants of similar rights and privileges. Having thus wisely limited the grant made to the market company, for which also an annual charge is exacted, and subjected it to the general supervision and control of the municipal government, it is inconceivable that Congress intended to make a grant to the city for public purposes subject to the unlimited control of a private corporation.

2. It remains now to consider the contention, that, irrespective of the construction claimed for section 16, the correspondence with the municipal officers, and their acquiescence for years in the exercise of authority by the market company, constitute a binding contract under which said company has the right to hold, use and regulate the wholesale market place, free from interference by the municipal authority, and subject to dispossession only by the express authority of Congress.

The letter of November 8, 1871, to Governor Cooke and his approval endorsed thereon, are entitled to no weight. He was vested with no authority whatever in the premises, and could not confer a franchise or make a contract for the District. What he could not do directly, certainly could not be done indirectly. *Kelley* v. *Milan*, 127 U. S. 139.

Although his approval was " subject to such regulations as the Legislative Assembly may hereafter prescribe," the matter seems never to have been referred to that body, where, if at all, the power to authorize such a contract existed.

This first communication is quite different, too, from the latter one. It asked permission to grade the grounds and to erect inexpensive platforms for the business of the market, with power to collect reasonable revenue for their use. In the second, the statement is made that the company has graded the grounds, purchased certain buildings thereon from the city of Washington, and commenced to erect certain large, open platform sheds, etc. The intention was

then announced, to retain sufficient of the revenues to pay all expenses of management and repairs of buildings and ten per cent. per annum upon cost of improvement, and to pay the remainder to the District.

The conclusion was in the following words : " If by authority of Congress, the company should at any time be dispossessed of the use and occupancy of the market grounds, it shall be entitled to receive a fair compensation for its buildings and improvements thereon."

The market company continued its possession, improvements and collection of revenue without action upon this communication. The first action with regard to it appears in the letter of Alex. R. Shepherd, vice-president of the Board of Public Works, dated April 26, 1874, in which he informs the company that the said board had *that day* voted to approve the proposed arrangement.

This letter is not even evidence of the official action of the board, which was composed of five members, much less a contract between the District and the market company. The law creating the board expressly required that its contracts should be in writing signed by the parties making the same, and when made that a copy thereof should be filed in the office of the secretary. 16 Stat. 427, sec. 37.

The power of the officers and agents of a public corporation to make contracts is to be strictly construed, and when a direction is given with respect thereto it must be pursued. Dillon Municipal Corp., sec. 445 ; Id. sec. 449 ; *Kelley* v. *Milan*, 127 U. S. 139 ; *Pettis* v. *Johnson*, 56 Ind. 139.

Again, the board was expressly forbidden " to make contracts to bind the District to the payment of any sums of money except in pursuance of appropriations made by law, and not then until such appropriations shall have been made."

But, without regard to the foregoing, had a contract been formally entered into between the board and the company, it would be void because clearly in excess of the powers vested in said board by law.

The ordinary matters of municipal control and regulation were conferred by the law upon the Legislative Assembly. 16 Stat. 425, sec. 18. The only power given to the Board of Public Works was the control and regulation of the repair of streets and alleys. Id. sec. 37.

The wholesale market space at the intersection of the named streets and avenues can hardly be called a street, since its setting apart as an open space for a market by act of Congress. But concede that it is to be considered as a street, the power to regulate its repair as a street did not confer the power to authorize the erection of buildings thereon, much less a contract to pay for them. The District Government and Board of Public Works combined would not have had the power to authorize buildings in a street or other public reservation, in the absence of an express grant of that power by Congress. Dillon, Municipal Corp., sec. 660 ; 15 Am. and Eng. Encyclopedia of Law, 1041.

Neither the Governor nor the Board of Public Works having the power to bind the District by express contract, it is idle to contend that they could accomplish the same purpose indirectly by acquiescing in the usurpation of power by the market company and permitting it to proceed upon the assumption that a contract right existed, and thus work an estoppel upon the public and the succeeding District Government. It is clear that the District can no more be concluded by their nonfeasance than it could be bound by their acts of malfeasance.

It follows that the decree dismissing the bill was right, and *it must be affirmed with costs to the appellee.*