If an action had been brought by a taxpayer of the town of Oxford to enjoin the issue of bonds in payment of its subscription to the Oxford 
Coast Line Railroad Company, any final judgment upon the merits would have operated as an estoppel, both upon other taxpayers of the town and the municipality itself. 2 Black Judgments, sec. *Page 202 
584. In two actions brought by that company against the mayor and commissioners of Oxford, asking for mandamus to compel the issuing of a subscription of $40,000 in bonds to the capital stock of the company, in which a controversy arose, among other matters, as to the authority to make such subscriptions, a compromise decree, drawn in pursuance of a previous agreement between the parties, was entered in the two suits, consolidated by order of the court into one, whereby the town was released from further liability upon the issue of $20,000 instead of $40,000 in its bonds, payable to the company, and upon surrendering its right to call for certificates of stock in the company to the amount of $40,000. If the decree concluded the town from questioning (362) the validity of the bonds, the estoppel would be as effectual in favor of the plaintiff, who sues upon past-due coupons, of which it is the owner, as if the action were brought by the railroad company. Thompson v. Lee County, 3 Wallace, 327. Prior to the passage of ch. 178, Laws 1874-75 (The Code, sec. 574) an agreement to receive a part in lieu of the whole of a debt due was held to be anudum pactum as to all in excess of the sum actually paid. Currie v.Canady, 78 N.C. 91; Hayes v. Davidson, 70 N.C. 573; Mitchell v.Sawyer, 71 N.C. 70; Love v. Johnston, 72 N.C. 415. But where such agreements have been made since the act was passed, they are deemed to have been entered into in as full contemplation of its provisions as though it had been incorporated into the contract. Koonce v. Russell,103 N.C. 179. Indeed, independent of statutes, where disputed claims have been preferred against it, "a town may make a contract with a creditor whereby the latter agrees to discount or throw off a portion, and such an agreement (says Judge Dillon) is founded upon a sufficient consideration, and will be enforced." 1 Dillon Mun. Corp., sec. 477;Baskerville v. Tweed, 20 Me. 178; Amy v. Shelby County, etc.,114 U.S. 387. In our case there were mutual considerations which, it would seem, would have given vitality to the contract and made it enforcible even at common law. The town surrendered its claim to $40,000 in certificates of capital stock, in consideration of being released from its obligation to issue forty instead of twenty $1,000 bonds to the railroad company. We can see no force in the contention that the failure to deliver a release in accordance with the decree in any way affects its validity when it does not appear that the railroad company ever refused or neglected, on demand, to execute it. The town cannot take advantage of the laches of its authorities in failing to demand its execution, (363) in order to repudiate their debt, if it is valid. The plaintiff was warranted in assuming that the town had demanded its execution and was not bound to look behind the decree to ascertain whether it had exercised common prudence in protecting itself. These twenty bonds *Page 203 
recite that they are issued in pursuance of the power and authority granted in chapter 49 of The Code, chapter 315, Laws 1891, and section 30, chapter 21, Laws 1885 (being the charter of the town), and also by virtue of an election held as provided for in the acts referred to, and in accordance with the compromise decree in the cases to which we have referred. It is conceded, without question, that no municipal corporation is authorized to issue bonds unless the power to do so is granted either in express terms or by necessary implication by the Legislature. The unavoidable implication arising from section 10, chapter 315, Laws 1891, (the charter of the company), is that it was the intention of the Legislature to empower "counties, cities, towns and townships" to issue bonds to aid in building the road, and to compel either corporate body that might lend its credit in that way to pay all such tax as it might collect on the franchise and property of the completed road, in payment of the interest accruing thereon. But it is insisted that the power cannot be exercised in the face of the prohibitory provision of the Constitution (Art. VII, sec. 7) unless the authority to loan its credit received the sanction of a majority of the qualified voters of the municipality, and that it is as essential to the validity of the bonds that the Legislature should in express terms authorize the election and require specifically a vote of a majority of the qualified voters, as that it should empower the town to aid. It is admitted to be an essential prerequisite to the validity of such bonds that the Legislature should grant the power to aid, and that the majority of the qualified voters should signify their approval by their ballots cast. The machinery for ascertaining the (364) will of the electors is a secondary consideration. The main purpose was to prohibit the imposition of a tax for certain objects without the assent of a majority of the qualified voters. The acts of 1891, in assuming that counties, towns and townships may subscribe, impliedly manifests a purpose on the part of the Legislature to allow municipalities "to issue bonds to aid in building" this railroad, and leaves them at liberty to aid as may seem to them best, and, by implication, to do what they were expressly allowed to do in the charter of the Oxford 
Clarksville road — either make donations or subscriptions. The statute puts no restriction upon the town as to the manner of issuing its bonds in aid of the construction, leaving them to donate or subscribe at their option, with the approval of the requisite number of voters. In Woodv. Oxford, 97 N.C. 227, Justice Merrimon, speaking of the contention that the provision in the railroad charter, that if a majority of the votes cast were favorable the town would be authorized to issue the bonds, was unconstitutional, said: "It may be that the statute contemplated that if a simple majority of the qualified voters, voting, shall be in favor of such donation, this shall be sufficient to authorize it to be made. This is *Page 204 
questionable, but we need not decide whether it so provides or not, because the purpose to allow such donation to be made is manifest, and it appears in the case before us that a clear majority of all the qualified voters of the town of Oxford voted in favor of the proposed donation of $40,000 in question, thus certainly meeting the essential prerequisites provided by the statute, and observing the provisions of the Constitution (Art. VII, sec. 7) forbidding towns and other municipal corporations to make a debt, except, etc., unless by a vote of a majority of the (365) qualified voters therein, and likewise observing the requirements of the charter of the town." It is now well settled that, under the constitutional provision, a majority of the qualified voters is necessary, and, in the absence of proof to the contrary, a majority of the registered voters will be deemed a majority of the qualified voters. Rigsbee v.Durham, supra.
The purpose of the Legislature to authorize the issue in our case in order to aid in any way they might deem best is apparent. The fact that a majority of the qualified voters have cast their ballots in favor of extending aid by subscription is undisputed. If it is not admitted, the records of the town showing that a proposition to allow the municipality to lend its aid by the issue of bonds was submitted after thirty days' notice, and a majority of the qualified registered electors signified their assent by voting "approved," and it is settled that such a record is conclusive evidence that the will of the majority was so expressed. Normentv. Charlotte, 85 N.C. 387; Cain v. Commissioners, 86 N.C. 8;Southerland v. Goldsboro, 96 N.C. 49; Duke v. Brown, ib., 127;McDowell v. Construction Co., 96 N.C. 514; Rigsbee v. Durham,98 N.C. 81. In some of the cases which we have cited it is declared by the Court to be immaterial that the act providing the machinery for ascertaining the wishes of the qualified voters had provided, in direct conflict with the Constitution, as construed by the Court, that a majority of the votes cast should be sufficient. These decisions rest upon the ground that the two evils intended to be guarded against were the using of the credit of municipal corporations, first, without the assent of the Legislature clearly given, and, second, without the approval of a majority of the qualified voters fairly ascertained. It was this broad view which inspired the intimation that either section 30 of the charter of Oxford, a section of a railroad charter which was declared, in (366) part, unconstitutional, or the constitutional provision itself in connection with the general election law, would be sufficient to authorize an election to ascertain the will of the voters, where the assent of the Legislature that the municipality might create a debt had been clearly given. In Wood v. Oxford the Court said (after what has already been quoted from the opinion): "As the purpose of the Legislature *Page 205 
to allow such donations to be made is clear and express, it is sufficient if the condition upon which it might be made has certainly, in the most adverse view of the proposition as to the vote, happened." In any aspect, it is beyond question that the requisite constitutional majority has approved of what the Legislature first clearly assented to — lending the aid of the town by issuing its bonds to the building of the railroad. With the legislative permission to so use its credit, we see no reason why the necessary implication should not follow that the town might ascertain the wishes of the voters in a way provided in the charter for the purpose of borrowing money in compliance with the same section of the organic law, or, in the absence of such special provision, under the general law governing elections held for municipalities, the natural inference being, when an election is authorized, that it is to be held in the usual, if some unusual mode is not provided. Where legislative sanction is given and the will of the majority of qualified voters is actually ascertained, it is certain that the danger line has not been crossed, so as to wrongfully subject municipalities to the burden of a debt for any purpose except necessary expenses. The imperative requirement of the Constitution is that there shall be a concurrence of the legislative and the popular will, the former evidenced by a grant of authority to vote, the latter by the record that a majority of the qualified voters have cast the ballots in favor of creating the debt. Whether the legislative purpose is expressed or may be fairly implied from (367) the language of the statute, is immaterial (1 Dillon, supra, sec. 89 (55); Clark v. Des Moines, 87 Am. Dec., 423), as is the question whether the election is conducted under statutes passed for the particular purpose, or, in the absence of such special provision, under the general election law enacted for the town or for counties generally, so that the sense of the voters is unquestionably and fairly ascertained. The power to subscribe being given, the fair implication was that the Legislature intended that the use of the machinery provided generally for taking a vote to authorize the borrowing of money might be used. The principle of strict construction is never "carried to such an unreasonable extent as to defeat the legislative purpose fairly appearing upon the entire charter or enactment." If the special provision for holding an election in a town or county fails to provide in detail the mode or what is in common parlance called the machinery for conducting it, it must be inferred that the Legislature intended that general election laws might be resorted to, to fill in the hiatus, and not that the legislative will should be thwarted or defeated by any such omission.
Brenan v. Bank, 144 U.S. 173, which was relied upon by the defendant, is clearly distinguishable from that at bar. If the only authority for issuing the bonds, that gave rise to this controversy, were the *Page 206 
provisions in the charter empowering the town to borrow money, it would be a case in point. But we have already adverted to the fact that the charter of the railroad company (section 9, chapter 315, Laws 1891) expressly contemplates and, by implication, authorizes the issuing of the bonds by the town to aid in the building of the road (not simply the borrowing of money by such towns for corporate purposes), and that, in accordance with a familiar rule of construction, all statutes bearing (368) upon the subject must be construed in pari materia. Every doubt must be resolved in favor of the constitutionality of any act passed by the Legislature (S. v. Moore, 104 N.C. 743); and upon the same principle, where the assent of the Legislature to the creation of a municipal debt has been given by fair implication, it would be "sticking in the bark" to render such expression of its will nugatory by insisting that special election machinery should have been provided for ascertaining the popular feeling, when general laws can be made to subserve the purpose. It must be conceded that the result of the election cannot be drawn in question in this collateral proceeding if the law authorized the holding of it. McDowell v. Construction Co., supra.
Pretermitting the question, whether the Court could look beyond the compromise judgment for the purpose of determining whether the statute authorized the holding of the election, we have preferred to declare that the town was, in fact, authorized by fair implication of law to hold it. The purchaser of such coupons as those sued upon must so far act upon the notice contained in the recitals, as a general rule, as to examine the statutes referred to, and ascertain at his peril whether the essential prerequisites to the validity of the bonds have been met, both by legislative and popular action. We hold that, upon a fair construction of the organic law and pertinent statutes, and their application to the facts of this case, there has been a sufficient compliance with the essential requirements of the law to render the election valid. We think, therefore, that the court erred in holding that the plaintiff was not entitled to recover, and the judgment of nonsuit must be set aside.
New trial.
DEFENDANT'S APPEAL.