UNION BANK OF RICHMOND, VA., v. BOARD OF COM'RS OF OXFORD, N. C.

(Circuit Court, E. D. North Carolina.   November 11, 1898.)

1. RES JUDICATA—EFFECT OF VOLUNTARY NONSUIT.
A matter is not res judicata, though litigated in the courts of a state, and passed upon by its supreme court, where, after such decision is made, and the case remanded, the plaintiff takes a voluntary nonsuit, as permitted by the state law, and no final judgment is entered.

2. FEDERAL COURTS—FOLLOWING DECISION OF STATE COURTS.
In questions belonging to the general domain of jurisprudence, where commercial securities and contracts between citizens of different states are involved, the jurisdiction of the courts of the United States is absolute, and they are not bound by the decision of a state court.[1]

3. CONSTITUTIONAL LAW — STATE DECISIONS AFFECTING OBLIGATION OF CONTRACTS.
Under the provision of the national constitution which forbids states to make laws impairing the obligation of contracts, that end can no more be accomplished by judicial decisions than by legislation.[1]

4. SAME—MUNICIPAL BONDS—EVIDENCE TO IMPEACH VALIDITY OF STATUTE.
Where, at the time municipal bonds were issued, the law of the state, as established by the decisions of its highest court, was that a copy of an act attested according to law by the presiding officers of the two houses of the legislature, and filed in the office of the secretary of state, was conclusive proof of the enactment and contents of the act, and the act under which such bonds were issued was so attested and filed, no change in such rule by subsequent decisions can authorize the validity of such bonds to be impeached by evidence from the journals of the legislature to show that the act authorizing their issue was not legally passed.[1]

5. MUNICIPAL BONDS—ESTOPPEL TO CONTEST VALIDITY—CONSENT JUDGMENT.
Where the officers of a municipal corporation had the power to issue bonds, and after their issue in a suit thereon a compromise judgment was entered by which such bonds were canceled, and new bonds in a smaller amount issued and accepted in their stead, such compromise was within the authority of the officers, and the judgment estops the corporation from making any defense to the bonds issued thereunder on account of any alleged infirmity in the original issue.

This was an action by the Union Bank of Richmond, Va., against the board of commissioners of Oxford, a town of North Carolina, to enforce the collection of municipal bonds.

Shepherd & Busbee and J. S. Manning, for plaintiff.
R. O. Burton, for defendants.

PURNELL, District Judge.   The facts agreed present the following case:   The town of Oxford was a duly-chartered municipal corporation under the laws of North Carolina, authorized to sue and to be sued, etc., as "the Board of Commissioners of Oxford."   In 1891 the general assembly of North Carolina passed an act to incorporate the Oxford & Coast Line Railroad Company, which act passed the senate in compliance with the requirements of the constitution; but in the house, it appears by the journal, the bill passed its second

[1] As to state laws as rules of decision in the federal courts, generally, see note to Wilson v. Perrin, 11 C. C. A. 71, and supplementary note to Hill v. Hite, 29 C. C. A. 553.

and third reading on the same day, and the ayes and nays were not entered on the journal on either reading. This admission is made with the right reserved to the plaintiff of objecting thereto, unless the court should decide that such impeaching testimony is admissible under the circumstances of this case. An election was held under the act (about which no question was raised) at which a majority of the qualified voters voted for a corporation subscription of $40,000 of the capital stock of the railroad company, and bonds to that amount were duly issued. In 1892 suit was brought by the railroad company asking for a mandamus against the commissioners of the town of Oxford commanding that body to levy taxes to pay interest coupons of said bonds. This suit was compromised, and a consent judgment entered at July term, 1892, of the superior court of Granville county. Under the compromise and consent judgment, the board of commissioners issued 20 bonds of the denomination of $1,000 each (in lieu of the $40,000 bonds issued in 1891), setting out the acts of the legislature, the litigation, and the judgment and decree. These bonds were delivered to the officers of the railroad company in August, 1892, and 16 sold in Richmond, Va., to the plaintiff, for value, September, 1892. The case has been before the supreme court of North Carolina (116 N. C. 339, 21 S. E. 410, and 119 N. C. 214, 25 S. E. 966), and after the opinion in the latter case, as reported, was certified to the superior court of Granville county, the plaintiff took a nonsuit.

This cause was heard on agreed facts, and, as presented, involves two questions: First, how far the decision of a state court binds the federal court as to municipal bonds held by a nonresident purchaser for value; and, second, whether a municipal corporation, acting by its corporate officers, can be estopped to set up the invalidity of such bonds by a consent judgment of a court of competent jurisdiction. The defendants rest their case upon the ground that the supreme court of North Carolina, in a case between the same parties, reported in 119 N. C. 264, 25 S. E. 966, has decided these bonds invalid, because of a failure in the house of representatives to observe the requirements of article 2 of section 14 of the state constitution. The matters involved are res judicata, and the federal courts will respect the opinion of the state court. Strictly speaking, under the facts agreed the matter is not res judicata, for in the facts agreed it is distinctly stated that the plaintiff in the state superior court voluntarily took a nonsuit, and there was no final judgment. This the plaintiff had a right to do. Graham v. Tate, 77 N. C. 120; Tate v. Phillips, Id. 126; Bank v. Board of Com'rs of Town of Oxford, 116 N. C. 340, 21 S. E. 410. Not being res judicata, the question next arises, is this one of those cases in which a federal court should be governed by an opinion delivered by the supreme court of a state? Where there is a well-settled rule of property in a state, or a well-settled line of decisions as to any matter of state law, or the construction of state statutes or state constitutions, the courts of the United States will always respect these decisions, and be governed by them. "It is a settled rule of these courts," as said Justice Swayne, in delivering the opinion of the court in Gelpcke v. City of

Dubuque, 1 Wall. 175, "in such cases to follow the decisions of the state courts. But there have been heretofore, as there doubtless will be hereafter, many exceptional cases. We shall never immolate truth, justice, and the law because a state tribunal has erected the altar and decreed the victim." The question involved in this case is the validity of certain bonds which the supreme court of North Carolina in a former decision in this identical case (116 N. C. 339, 21 S. E. 410) held to be valid in all essential particulars, and belongs to the domain of general jurisprudence. In this class of cases the supreme court of the United States, in Talcott v. Pine Grove Tp., 19 Wall. 661, says: "The United States courts are not bound by the judgments of the courts of a state where the case arises." The national constitution forbids the states to pass laws impairing the obligation of contracts, and that end can be accomplished no more by judicial decision than by legislation. Were these courts to yield in cases like this, of oscillating opinions, or even decisions of the courts of the respective states, they would abdicate the performance of one of the most important duties with which they are charged, and disappoint the wise and salutary policy of the framers of the constitution in providing for the creation of an independent federal judiciary. The authorities to this effect are numerous and uniform. And in most of the cases cited there was a final judgment in the state court, and the matter was res judicata as far as they could make it so. But in the case at bar there is no final judgment, and nothing to prevent a federal court taking jurisdiction of the matter otherwise properly constituted in such court. In questions belonging to the domain of general jurisprudence, where commercial securities and contracts between citizens of different states are involved, the jurisdiction of the courts of the United States is absolute when sought; and these courts must hear and determine such questions independent of the tribunals of the state in which they arise. If this be so, when there is a final judgment the mere publication of an opinion by a state court in a cause where there is no final judgment will not bind the United States courts, or oust them of their jurisdiction. So, when a question falling under the laws or constitution of the United States—a federal question—is presented, the United States courts have a clear jurisdiction, and would fail in the purposes for which they were created, if they did not take jurisdiction, even though their decisions conflict with that of the state court. My conclusion is that there is nothing in the facts agreed to prevent this court hearing and determining the questions involved.

It is well settled that the laws which are in force at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of the contract as much as, though they were incorporated in its terms. This principle embraces the acts which affect its validity, construction, discharge, and enforcement, or the remedies under the contract. Von Hoffman v. City of Quincy, 4 Wall. 535; Walker v. Whitehead, 16 Wall. 314; Edwards v. Kearzey, 96 U. S. 595; Barnitz v. Beverly, 163 U. S. 118, 16 Sup. Ct. 1042. And this means that the law as understood and construed by the courts where the contract is made

and to be performed enters into the contract. Chief Justice Taney, in delivering the opinion of the court in Trust Co. v. Debolt, 16 How. 432, says: "Indeed, the duty imposed upon this court to enforce contracts honestly and legally made would be vain and nugatory if we were bound to follow those changes in judicial decisions which the lapse of time and the change in judicial officers will often produce; * * * and the sound and true rule is that, if the contract, when made, was valid by the laws of a state as then expounded by all the departments of its government, and administered by its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature, or decisions of its courts, altering the construction of the law." Justice Harlan, delivering the opinion in Taylor v. Ypsilanti, 105 U. S. 71, quoting the above opinion with approval, says that this doctrine is no longer open to question in this court. "It has been recognized for more than a quarter of a century, and is an established exception to the general rule that the federal courts will accept or adopt the construction which the state courts give to their own constitution and laws." Several opinions are cited sustaining the view that the construction of the state statute, as far as contract rights acquired under it are concerned, becomes as much a part of the statute as the text itself; and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment to the law by means of a legislative enactment, and the rights of the parties are to be determined according to the law as it was judicially construed to be when the bonds in question were put on the market as commercial paper.

Under this principle it becomes of vital importance to know what was the law in North Carolina, as enunciated by the highest court of the state, at the time the contract under consideration was entered into,—1891,—or what was the law of the state affecting such commercial paper in 1892, when the bonds were issued and sold to the plaintiff on the market in another state. It is admitted in the facts agreed that the journal of the house of representatives shows a failure to comply with article 2 of section 14 of the constitution, but "it is understood and agreed that this admission as to what appears on the journal is only to be considered should the court decide that such impeaching testimony is admissible under the circumstances of this case."

There was apparently both legislative and judicial authority, ample and complete, for the issue of the bonds in question; and the supreme court of the state (116 N. C. 339, 21 S. E. 410), in a learned opinion, decided all essential matters in favor of the validity of the bonds. As far as it goes, the law of North Carolina, as understood by the courts and the legal profession, is embodied in that opinion. The act of the legislature and other questions decided therein give validity to the bonds as set forth in the face of the bonds themselves,—the legislative and judicial authority to issue such bonds. The purchaser, of course, should inquire into the power to issue bonds. He saw this set forth in the face of the bond itself; and if he inquired further, or verified the record, either personally or

through an attorney learned in the law, neither would have been wiser or more learned than the supreme court of the state, which court, at February term, 1895, decided in favor of the validity of these bonds. If such purchaser or his attorney examined the act of the legislature, he found it certified to as required by the laws of North Carolina, and published in the volume of the public laws. Was it incumbent on him to look further?

In the same volume (Carr v. Coke, 116 N. C. 223, 22 S. E. 16), in a case where it was alleged and offered to be proved by the journals and other evidence that an act of the legislature had passed neither house of the general assembly, but had been certified by the presiding officers, the supreme court of North Carolina held, emphasizing the line of decisions by that court, that, "where it appears that a bill has been duly signed by the presiding officers of the two houses of the general assembly, the courts cannot go behind such ratification to inquire whether it was fraudulently or erroneously enrolled before it had passed the requisite reading by each house." A more extreme case can hardly be imagined,—where the certificate of the presiding officers made law affecting the commercial interests of the state a bill which had not passed either house. The decision, though, was in conformity with what was said by Chief Justice Pearson, speaking for the court, in Brodnax v. Groom, 64 N. C. 244: "That the ratification certified by the lieutenant governor and the speaker of the house of representatives makes it a matter of record which cannot be impeached before the courts in a collateral way." To the same effect is Gatlin v. Town of Tarboro, 78 N. C. 119, decided in 1878, and other decisions to the same effect. The judges recognized the gravity of the question in Carr v. Coke, and there were two dissenting opinions, in which the distinction was drawn between a collateral and a direct attack upon the record; but the majority of the court decided the law as it has always been understood. The courts of the state have adopted the English rule, and acted on the maxim, "Omnia præsumuntur rite esse acta," and that more importance is to be attached to the acts of the lieutenant governor, —the second highest officer of the state elected by the people,—as presiding officer of the senate, and the speaker of the house of representatives, than to those of the journal clerk, irresponsible, and with much less at stake in his official acts. At the time these bonds were issued, the law of North Carolina, as construed by the courts of the state, based both upon the ground of public policy and upon the ancient and well-settled rule of law (whatever changes may have taken place since in judicial decision, which can only govern for the future), was that the copy of an act attested according to law by the presiding officers of the two houses of the legislature, and filed in the office of the secretary of state, is conclusive proof of the enactment and contents of the statute of the state, and that such attested copy cannot be contradicted by the legislative journals or in any other manner.

This being the law at the time and place where the contract embodied in the bond was entered into, the defendants are not entitled to the impeaching testimony embodied in the journal of the house of rep-

resentatives; and the act of the legislature under which the election was held and the bonds issued must be held to have been passed with all the solemnity and formality requisite to a valid act of the general assembly of North Carolina, and the bonds issued in pursuance of such act are valid, and binding upon the defendants in this cause. To hold otherwise would be to impair by judicial decision the obligation of a contract made in compliance with the law, which the constitution of the United States does not permit.

Second. Is the defendant corporation estopped or bound by the waiver of the defense as to the validity of the bonds by the consent judgment entered in the superior court of Granville county? Consent judgments do not establish principles. They are too often signed as a matter of course, at the solicitation of counsel, and only signify the court consents that litigants may settle their controversy by agreement, make such agreement matter of record, and give to it the dignity of a decree. It will hardly be contended such judgments are not binding inter partes. They are contracts in the most solemn form, sanctioned by the court, and cannot be collaterally attacked. There is no suggestion of fraud, irregularity, or even excusable neglect. But it is argued that because defendant is a municipal corporation, represented by the several defendants named, a consent judgment would not be binding; and as authority for this position Kelley v. Milan, 127 U. S. 139, 8 Sup. Ct. 1101, and Brownsville v. Loague, 129 U. S. 493, 9 Sup. Ct. 327, are cited. A full discussion of this position would involve the nice distinctions drawn by eminent authorities of definitions, which are sometimes dangerous. Many definitions of a corporation have been attempted. Most of them are too narrow, and many too broad. Most of them include one or more faculties which are not essential. Kyd, Corp. 70; Thomas v. Dakin, 22 Wend. 70; Dill. Mun. Corp. (4th Ed.) 18; Ang. & A. Corp. 1, 30; Dartmouth College v. Woodard, 4 Wheat. 518; Memphis & L. R. R. Co. v. Railroad Com'rs, 112 U. S. 609, 5 Sup. Ct. 299. But, disregarding the nice distinctions, all authorities agree the corporation acts by and through its designated officers, one or more, and except where such acts are ultra vires the body is bound thereby. The personnel of the officers may be changed, and the present officers of defendant corporation may be imbued with different ideas or conceptions of the law from their predecessors, but courts can recognize no changes in the personnel of corporate officers. It is a corporate body, with which the courts must deal, and not the officers. If their predecessors acted within the scope of their authority, the present officers would be bound by such action, as would the corporation itself. An examination of the authorities cited in no way conflict with this position. In the first case cited the want of authority in the municipal officers to issue the bonds under consideration appeared in the statute (Kelley v. Milan, supra), and in the second case it was an application for a mandamus to compel the levy of a tax, and it appeared that the municipality was without power to levy a tax to pay coupons of municipal bonds which had been declared void (Brownsville v. Loague, supra). This last decision is cited and commented on in

Franklin Co. v. German Sav. Bank, 142 U. S. 93, 12 Sup. Ct. 147, which is a strong authority for the position that the judgment of a court having complete jurisdiction of a cause cannot be collaterally attacked. But whether the judgment in the mandamus proceeding, entered in pursuance of a compromise, by consent, in the state court, is an estoppel, or the waiver of the defense of the invalidity of the bonds in that proceeding is binding on the defendant corporation, depends upon the power of the commissioners or municipal officers to issue the bonds originally. True, defendant had its day in court, and waived this defense, and not only consented to final judgment, but the judgment of the court was performed; the bonds have it set out in their face as authority for their issue, in addition to the act of the legislature. This would be binding on defendant corporation and its officers, unless such action was ultra vires. The doctrine of accord and satisfaction does not obtain in North Carolina since the adoption of the Code in 1868. If defendant's officers had the power to issue the bonds originally, the consent judgment would be binding, and an estoppel. If, however, there was a want of power to issue the bonds originally, the consent judgment would not confer the power, or validate the bonds. To put it differently: If the defendants can now go behind the ratification, examine the journal of the house, and that journal shows the conditional admission, the consent decree would not confer power the corporate officers did not possess. In the view now taken of the first question, as a compromise under the Code the consent decree is an estoppel.

A decree will be drawn granting judgment in favor of the plaintiff for the sum of $4,320, with interest as set forth in the first prayer for relief, and a writ of mandamus will issue to the defendants, the commissioners of the town of Oxford, to levy sufficient taxes to pay this judgment and the costs of this action, to be taxed by the clerk.