UNION BANK OF RICHMOND v. OXFORD & C. L. R. CO.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1906.)

No. 581.

SALE—WARRANTY OF VALIDITY OF BONDS—RIGHT TO RECOVER CONSIDERATION PAID.

An officer of defendant railroad company was authorized by its directors to sell certain bonds which had been issued to it by a town to aid in the construction of its road, and pursuant to such authority sold them to the president of plaintiff bank acting on its behalf. Prior to and during the negotiations, such officer expressly stated in writing to the purchaser that the bonds were valid and had been so adjudged by a court of the state, and the purchase was made in reliance on such representation. The bonds were in fact void for want of power in the town to issue them, and were subsequently so adjudged. *Held,* that the statement of their validity made as an inducement to the sale was an express warranty that they had a valid legal existence as securities which was binding on defendant, and that plaintiff was entitled to recover from defendant thereon the consideration paid therefor.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, §§ 732, 1126.]

In Error to the Circuit Court of the United States for the Eastern District of North Carolina.

Wm. L. Royall (A. S. Lanier, on the brief), for plaintiff in error.

T. B. Womack and A. B. Graham (Graham & Devin, on the brief), for defendant in error.

Before PRITCHARD, Circuit Judge, and WADDILL and KELLER, District Judges.

PRITCHARD, Circuit Judge. In the year 1891, the Legislature of North Carolina chartered the Oxford & Coast Line Railroad Company, and, among other things, the act authorized the town of Oxford to issue bonds in aid of the construction of the said railroad. The town subscribed $40,000 and agreed to issue its bonds for that amount. Subsequently it failed to issue them, and the railroad applied to the state court for a mandamus to compel it to issue the same. A compromise was reached in that suit, whereby the town of Oxford agreed to issue $20,000 of its bonds for the purposes hereinbefore mentioned, and this compromise was embodied in a judgment of the court. In pursuance of this judgment, the town issued 20 bonds in the denomination of $1,000 each, interest payable August 1st and February 1st, each year, and delivered the same to the Oxford & Coast Line Railroad Company. The directors of the railroad company authorized A. W. Graham, its second vice president and chairman of its committee of construction, to hypothecate the bonds for a loan or to sell the same. On August 26, 1892, Vice President Graham wrote A. L. Boulware, president of the First National Bank of Richmond, asking a loan of $4,000 upon the bonds. In this letter he said: "The validity of the bonds has already been passed upon by the superior court at the July term, 1892." The First National Bank loaned the railroad company $4,000 on eight of the bonds. On August 29, 1892, Graham again wrote

143 F.—13

Boulware another letter in which he said: "The bonds spoken of are valid, and would be a good investment for any one seeking securities of the kind."

It appears from the record that on September 6, 1892, Graham visited Richmond and saw Boulware, who had some negotiations with him looking to a purchase of all or a part of the bonds mentioned for an undisclosed principal, though no definite conclusion was reached. Graham went to Baltimore, and endeavored to sell the bonds there, but did not succeed in doing so. On September 9th, he wrote to Boulware of his efforts in this behalf and asked him to telegraph what he would do. On September 10th, Boulware telegraphed him that he would take all of the bonds at a price to net the railroad company 95 per cent. The offer was accepted, and the other bonds were forwarded to Richmond. Boulware was a director in the plaintiff in error's bank and was negotiating the purchase of 16 of the bonds for it. The bank took 16 of the bonds and paid the money to the railroad ocmpany, and the same was used in the construction of its road. The town paid the first coupon on the bonds falling due February 1, 1893, but, when the second one came due, August 1, 1893, it defaulted. The bank instituted an action against the town of Oxford in the state court for the amount then due on coupons. The court decided in favor of the town. The bank appealed, and the Supreme Court of the state reversed the judgment and sent the case back for a new trial. 116 N. C. 339, 21 S. E. 410. During the progress of the second trial the town raised the question that, when the act authorizing the issuance of the bonds passed the Legislature of North Carolina, it was not read in the House of Representatives on three different days, as the Constitution of the state required, but passed its second and third reading on the same day, and the yeas and nays were not entered on the journal on the second and third readings, as required by the Constitution. The court overruled the defense and rendered judgment against the town, but, on appeal, this judgment was reversed and the case was remanded for a new trial. 119 N. C. 214, 25 S. E. 966, 34 L. R. A. 487. The bank then took a nonsuit in the state court and instituted action against the town on the overdue coupons in the Circuit Court of the United States for the Eastern District of North Carolina. 90 Fed. 7. The defendant interposed the same defense in that suit, but the Circuit Court overruled it, and rendered judgment against the town. On writ of error to this court the judgment was reversed, upon the ground that the failure to comply with the Constitution of the state in passing the act rendered the bonds void. Board of Com'rs of Oxford v. Union Bank of Richmond, 96 Fed. 293, 37 C. C. A. 493. Application was made to the Supreme Court of the United States for a writ of certiorari in that case, but it was denied. 22 Sup. Ct. 940, 46 L. Ed. 766. Thereupon, in July, 1903, the bank demanded of the railroad company a return of the money paid for the bonds. The demand was refused, and the bank brought this action against the defendant in error to recover the money paid by it for the bonds. The case was tried in the Circuit Court in December, 1904. The defendant in error pleaded the statute of limitations, and also defended on the merits. There was a trial by jury of the issues submitted.

The issue as to whether the action was barred by the statute of limitations was found in favor of the plaintiff in error. But, under the instructions given by the court, the jury found that the railroad company made neither an implied or an express warranty in selling the bonds, and judgment was rendered in favor of the defendant in error.

It will be seen from an inspection of the record that all questions involving the validity of the securities of the town of Oxford have been settled in its favor by both the state and federal courts, and we are now called upon to decide whether the plaintiff in error, upon the facts stated in the record, has a good cause of action against the defendant in error, the determination of which depends upon whether the defendant in error warranted the validity of the bonds in question. And, second, whether the action is barred by the statute of limitations. It is not sought to recover upon the contract contained in the bonds which have been decided to be void for want of power in the town of Oxford to issue the same, but this action is based on an express warranty. In order to maintain the present action, it is not necessary to establish the validity of the contract between the town of Oxford and the railroad company, but, among other things, it is incumbent on the plaintiff in error to disaffirm such contract as being unlawful and therefore void.

It appears from the record that the town of Oxford, in pursuance of an act of the Legislature of North Carolina agreed to issue $40,000 of its bonds to aid in the construction of the Oxford & Coast Line Railroad from Oxford to a point on the Durham & Northern Railroad. It further appears that there was a controversy between the town of Oxford and the railroad company relative to the issuance of the bonds which resulted in a suit being brought by the railroad company against the town in the state court, which was finally settled by a compromise judgment rendered in favor of the railroad company and against the town, in which it was provided that the town should issue and deliver to the railroad company 20 bonds in the denomination of $1,000 each, which it afterwards delivered. The recitals contained in the bonds to the effect that the same were issued in pursuance of the "powers and authority granted by the state of North Carolina as provided in chapter 49 of the Code of North Carolina of 1883, and in pursuance of the authority granted in section 30 of the charter of the said town of Oxford which is embraced in the Private Laws of 1885 (Laws 1885, p. 746, c. 21), as passed by the General Assembly of said state and in pursuance of the authority granted by chapter 315, p. 269, of the laws of 1891, passed by the General Assembly of North Carolina, ratified the 5th day of March, 1891, entitled an 'Act to incorporate the Oxford & Coast Line Railroad Company.' And in pursuance of an election held in said town of Oxford on the 27th of April, 1891, and of a settlement and adjustment of a controversy and litigation in which the Oxford & Coast Line Railroad Company et al. were plaintiffs and the board of commissioners of Oxford and the mayor of said town were defendants, adopted by the said board of commissioners July 25, 1892, and the judgment and decree of his Honor H. G. Connor, judge presiding in said action at July term, 1892, of Granville superior court." On the 26th day of August, 1892, A. W. Graham,

chairman of the construction committee and second vice president of the Oxford & Coast Line Railroad Company, wrote a letter to A. L. Boulware, president of the First National Bank of Richmond, stating that the town of Oxford had issued $20,000 in 30-year bonds with interest at 6 per cent. in aid of the construction of the railroad which he represented and on which he requested a loan of $4,000. In this letter, among other things, he said: "The validity of the bonds has already been passed upon by the superior court at the July term, 1892." The bank made the loan to the railroad company on eight of the bonds. On August 29th, Graham again wrote Boulware a letter, in which he stated: "The bonds spoken of are valid and would be a good investment to any one seeking securities of the kind." In pursuance of the negotiations which were begun at that time, Boulware purchased for his undisclosed principal the bonds on which this action is based. The plaintiff in error now seeks to recover from the defendant in error the amount paid for the bonds as money had and received, upon the ground that there was both an express and an implied warranty of the same by the defendant in error through its agent and representative at the time the bonds were purchased.

In this view of the case, it is necessary that we should determine whether the bonds were purchased under such circumstances as to justify either of the contentions of the plaintiff in error as to warranty. In view of the facts in this case, we deem it only pertinent to determine whether the statements made by the defendant in error through its agent were of such a character as to amount to an express warranty.

In the case of Reese v. Bates, 94 Va. 330, 26 S. E. 869, the court said:

"Every man is presumed to intend the consequence of his own act. When therefore a vendor negotiating a sale makes an affirmation of quality as an assurance of fact which is relied on by the buyer, it constitutes a warranty, for the vendor will be presumed to have so intended. So we find, in Smith v. Justice, 13 Wis. 600, the vendor having made such a representation of facts in order to induce a sale, and that representation being relied on by the defendant, it was held to be a warranty, and he was not allowed to avoid the effect of his representations by proof that he did not intend to warrant."

The Court of Appeals, in the case of Reese v. Bates, supra, in discussing the authority of an agent acting in the capacity in which Graham acted on the occasion in question, says:

"From these authorities it appears that there are warranties which an agent to sell may make as one of the incidents of that employment, and of the power to make which the court will take judicial notice. They are such warranties as are usual. For example, a general agent to sell horses may warrant the soundness of a horse; for this is a warranty usually given in such transactions."

This rule applies with equal force to an agent who has authority to sell bonds, and it necessarily follows that Graham, being employed to sell the securities of the railroad company, possessed authority to represent that the same were valid. The railroad company was therefore bound by the express representations of its agent, to wit, that the bonds were valid. The representations by Graham cannot

be treated as an idle statement and made for no particular purpose, but must be considered in view of the circumstances surrounding the transaction at the time they were made. To say that such representations were made for any other purpose than as an inducement to the bank to part with its money would be to assume that a banking institution, doing business in a neighboring state, would be willing to invest its money in the purchase of securities of a town in North Carolina, without taking the precaution to make inquiry as to the validity of such securities, and that it would be willing to make such an investment without any representation as to the validity of the same. The more reasonable and logical construction is that the bank was induced to make the purchase by the express warranty of Graham as to the validity of the bonds.

In the case of Hobart v. Young, 21 Atl. 613, 12 L. R. A. 696, 697, the Supreme Court of Vermont, in discussing this question, said:

"An important question is whether the words 'sound and kind,' contained in the bill of sale, constitute an express warranty as matter of law. The law of warranty has undergone much change since Chandelor v. Lopus, Cro. Jac., 4, decided in Exchequer Chamber in 1803. It was there held that an affirmation that the thing sold was a bezoar-stone was no warranty; for it was said, every one in selling his wares will affirm that they are good, or that the horse he sells is sound; yet, if he does not warrant them to be so, it is no cause of action. But latterly courts have manifested a strong disposition to construe liberally in favor of the purchaser what the seller affirms about the kind and quality of his goods, and have been disposed to treat such affirmations as warranties when the language will bear that construction, and it is fairly inferable that the purchaser so understood it. Stone v. Denny, 4 Metc. (Mass.) 155; Hawkins v. Pemberton, 51 N. Y. 198, 10 Am. Rep. 595. And now any affirmation as to the kind or quality of the thing sold not uttered as matter of communication, opinion, or belief made by the seller pending the treaty of sale, for the purpose of assuring the purchaser of the truth of the affirmation and of inducing him to make the purchase, if so received and relied upon by the purchaser, is deemed to be an express warranty."

This is very much in point and clearly indicates a disposition on the part of the courts to depart from the rule laid down in Chandelor v. Lopus, Cro. Jac. 4, which lapse of time and the development of our commercial system have demonstrated to be impracticable and antagonistic to the well-settled principle of the law that every wrong has a remedy, and that no one can be deprived of his property without being afforded a means of redress. The trend of judicial sentiment in this country is to the effect that one shall not be permitted to enjoy the benefit of another's property without compensating him for the same. To hold otherwise would be to place a premium upon subterfuge and technicality, a thing which the law never regards with favor.

It may be insisted, and no doubt will be, that to hold in favor of the plaintiff in error in this instance will be to deprive the railroad company of the contribution which was intended to be made by the town of Oxford in the first instance. As the matter now stands, that will be so, but, in such case, the railroad company will only be deprived of a gratuity, while, on the other hand, if we should hold that the bank is not entitled to recover the money which it was induced to advance to the railroad company, it will be damaged to the extent

of the amount involved. However, these are matters which we cannot consider in passing upon the rights of individuals.

In the case of Meyer v. Richards, 163 U. S. 386, 16 Sup. Ct. 1148, 41 L. Ed. 199, the state of Louisiana had issued several bonds under an act known as "No. 174" and designated as "consolidated bonds." A number of these bonds were in the hands of the public and some were held by the treasurer of the state as the property of the state. The constitutional convention of Louisiana adopted an ordinance declaring the "consolidated bonds" that were in the treasury of the state null and void. Subsequently the treasurer purloined 13 of these bonds and disposed of the same, which finally passed into the possession of Richards, an innocent purchaser, who sold the same to Meyer.

It appears that both parties to this transaction acted in good faith. Some time after Meyer bought the bonds the state authorities discovered that a fraud had been practiced by the state treasurer in disposing of the bonds in the manner described, and refused to pay interest on the same. Meyer then brought suit against Richards for a return of the money that he had paid for the bonds, and the Supreme Court of the United States, in a very able and exhaustive opinion delivered by Mr. Justice White, decided that Richards must return the money that Meyer had paid him. The conclusion reached, being that, under the civil law in such cases, there is a warranty of the validity of the bonds, and that at common law there is a warranty in all such cases that the thing sold has an existence, and in that case, the bonds being void under the organic law, the same had no actual existence. That, inasmuch as the bonds had no actual existence, the seller was bound both by the civil and common law to return the money which had been paid to him by Meyer. In that case there was no question as to the validity of the law under which the bonds were issued, nor was there any question as to the binding obligation of the state, or anything in the face of the bonds sold to Meyer to indicate that the same belonged to the particular class of bonds which had been declared void by the ordinance of the convention. If Meyer had known at the time of the purchase of the bonds that the same belonged to the class that had been declared void, then the doctrine of caveat emptor would have applied, and Richards could not have been held to have warranted the validity of the bonds upon the principle of the common law that where one sells a thing he warrants the actual existence of the thing sold. In this case there is an express warranty as to the validity of the bonds, and it appears from the record that the plaintiff in error was induced to part with its money on account of such warranty.

It is insisted by the defendant in error that the case of Otis et al. v. Cullum, 92 U. S. 449, 23 L. Ed. 496, should govern; but, when we consider the facts in that case, it is easy to distinguish it from the one at bar. In that case the Legislature of Kansas passed two acts in which the city of Topeka was authorized to issue bonds for certain specified purposes; the amount in each case to be within the limits prescribed. One hundred of the bonds in the denomination of $1,000 each, payable to the party named or bearer, were executed and delivered to that party, and subsequently became the property of the

First National Bank of Topeka. That bank afterwards placed the bonds on the market and disposed of the same. Eighteen of these bonds were sold to the plaintiff in error for the sum of $12,852, and the residue to another party. There was a default in the payment of interest. The other party brought suit. It was held that the Legislature had no power to pass the acts, and the bonds were void. Suit was then brought to recover from the receiver the amount paid to the bank for the 18 bonds so purchased by the plaintiff in error. Mr. Justice Swayne, who delivered the opinion of the court, in discussing the questions involved, said:

"Here, also, the plaintiffs in error got exactly what they intended to buy, and did buy. They took no guaranty. They are seeking to recover, as it were, upon one while none exists. They are not clothed with the rights which such a stipulation would have given them. Not having taken it, they cannot have the benefit of it. The bank cannot be charged with a liability which it did not assume. Such securities throng the channels of commerce, which they are made to seek, and where they find their market. They pass from hand to hand like bank notes. The seller is liable ex delicto for bad faith, and ex contractu there is an implied warranty on his part that they belong to him, and that they are not forgéries. Where there is no express stipulation there is no liability beyond this. If the buyer desires special protection he must take a guaranty. He can dictate its terms, and refuse to buy unless it be given. If not taken, he cannot occupy the vantage ground upon which it would have placed him."

There was nothing in the case of Otis et al. v. Cullum, to show an express stipulation as to the validity of the bonds. Hence, it is easy to distinguish that case from the one now before us. In that case it was not contended by the plaintiff in error that it had been induced to part with its money on the representations made by the defendant. However, in the case of Meyer v. Richards, it is held that at common law where a party offers a security which, at the time, he believes to be valid and induces another to purchase the same, who has no notice of any defect, and it afterwards develops that the security disposed of is void and has no existence, the party who parts with his money may recover the same upon an implied warranty. But in this case the question of an implied warranty is not involved, but the cause of action depends solely upon the question as to whether there is an express warranty.

It is insisted that the bank was charged with notice of any defects in the acts authorizing the issuance of the bonds and of the want of power on the part of the town of Oxford to issue the same, and therefore the plaintiff in error is not entitled to recover in this action. Such contention would undoubtedly be true if this were an action against the town of Oxford, but the action is not based on the validity of the bonds, but, as already stated, is instituted upon the theory that the securities are worthless, and that the railroad company procured the money of the bank by virtue of the representations made by its agent and representative that the same were valid and would be a good investment, and the further representation that the validity of the bonds had been established by a judgment of the superior court. Here, was an express warranty on the part of the railroad company that the bonds in question were valid and binding obligations, and the

representation was of such character as to induce the plaintiff in error to part with its money.

In the case of Central Transportation Co. v. Pullman's Car Co., 139 U. S. 60, 61, 11 Sup. Ct. 488, 35 L. Ed. 55, Mr. Justice Gray, who delivered the opinion of the court, among other things, said:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain an action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained on the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for property or money which it has no right to retain. To maintain such an action is not to affirm but to disaffirm the unlawful contract. The ground and limits of the rule concerning the remedy in the case of a contract ultra vires, which has been partly performed, and under which property has been passed, can hardly be summed up better than they were by Mr. Justice Miller, in a passage already quoted, where he said that the rule 'stands upon the broad ground that the contract itself is void, and that nothing which has been done under it, nor the action of the court, can infuse any vitality into it'; and that, 'where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands.'" Penn. R. R. Co. v. St. Louis & C. R. R., 118 U. S. 317, 6 Sup. Ct. 1094, 30 L. Ed. 83.

That the bank parted with its money, and that the defendant in error received the same and used it in the construction of its road cannot be denied, nor can it be reasonably insisted that the plaintiff in error was not induced to part with its money by the representations of the railroad company that the securities were valid. If the representative of the bank had examined the legislative journals of the state, he would have found that the act authorizing the issuance of the bonds in question had passed that body just as other acts, and that the regularity of its passage was certified by the officers charged with that duty; and, if a critical examination of the reports of the Supreme Court of the state had been made, no decision could have been found, at that time, affecting in the slightest degree the validity of the statute authorizing the issuance of the bonds. It is therefore reasonable to assume that the bank relied solely upon the representations that were made by the railroad company. But in this class of cases one is not held to that degree of diligence in order to justify a recovery, as he would be in cases where he deals directly with a corporation which has issued its bonds.

The defendant in error seeks to have a review of the action of the court in submitting to the jury the issue as to the statute of limitations, but that question is not before us for consideration. However, we are of opinion that the plaintiff in error's cause of action did not accrue until after the final determination of the litigation in the Circuit Court of the United States and the refusal of the Supreme Court to grant a writ of certiorari. Under these circumstances, we are satisfied that the finding of the jury as to the statute of limitations in favor

of plaintiff in error was proper, and we would not be inclined to disturb such finding on that account, even if that question were before us for our consideration.

The stipulation as to the validity of the bonds being in writing, and no evidence being introduced by defendant, and there being no dispute as to the facts, it devolved on the court to determine as a matter of law whether the plaintiff was entitled to recover. We therefore think the court erred in refusing to instruct the jury to find a verdict in favor of the plaintiff as requested in instruction No. 1, of the plaintiff's prayers for instructions.

The judgment of the Circuit Court is reversed, and the case remanded to that court with instructions to set aside the verdict and award a new trial, and to proceed thereafter in conformity with the views herein expressed.

Reversed.